RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MICHAEL DEAN SCOTT,

        *Petitioner-Appellant,*

*v.*

MARC HOUK, Warden,

        *Respondent-Appellee.*

No. 11-4361

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:07-cv-753—John R. Adams, District Judge.

Argued: June 26, 2014

Decided and Filed: July 28, 2014

Before: COLE, GRIFFIN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Megan Dillhoff, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, John P. Parker, Cleveland, Ohio for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

COLE, Circuit Judge. After his conviction in Ohio state court for two murders and the aggravated robbery and kidnapping of one of his victims, petitioner Michael Dean Scott was sentenced to death. Scott appealed and pursued post-conviction remedies in state court, to no avail. He now seeks habeas relief under 28 U.S.C. § 2254. The district court denied relief.

1

Scott obtained a certificate of appealability and now presents four arguments: (1) that Ohio's "course-of-conduct" capital specification was unconstitutional as applied to his case; (2) that the trial court erroneously failed to merge two other aggravating specifications, for robbery and kidnapping; (3) that his trial counsel provided ineffective assistance, first by giving him erroneous advice about the risks of making an unsworn statement, and second by failing to present certain mitigating evidence at the penalty phase of trial; and (4) that Ohio's method of execution by lethal injection is unconstitutional.

Scott did not present his first argument in state court, so it is procedurally defaulted. AEDPA's stringent standard of review applies to Scott's second and third claims, and because Scott cannot show that the Ohio courts reached a decision that contravened or unreasonably applied Supreme Court precedent, he is not entitled to relief on these claims. Finally, as to his fourth claim, Scott is currently challenging Ohio's execution procedures in federal district court, in a separate action brought under § 1983, and we conclude that consideration of this issue is properly confined to that forum. We therefore must affirm the district court's denial of relief.

## I. OVERVIEW

### A. Factual Background

The facts surrounding Scott's crimes are not in dispute. The relevant events began on August 24, 1999, in the early morning, as Scott and his friends Michael Wilson and Ryan Allen were walking from a mall in Canton, Ohio, to another friend's apartment. During their walk, a man named Dallas Green drove by, and Scott yelled out to him. Although Scott and Green apparently did not know each other, Green stopped his car and got out, and the group began talking. As the Supreme Court of Ohio explained it, Green then insulted Scott and his friends, "talking as if the others 'were his girlfriends'" and "telling each, 'You are my bitch.'" *State v. Scott*, 800 N.E.2d 1133, 1137 (Ohio 2004).

Green eventually returned to his vehicle. Scott asked Green for a ride, which Green refused him, and then asked for the time. "When Green turned his head to look at the clock on the dashboard, Scott pointed a .22 caliber handgun at him, said, 'Now who the bitch mother fucker,' and then shot Green twice in the back and once in the left cheek." *Id.* Green later died from the gunshot wounds. *Id.*

Scott and his friends fled the scene, and Scott warned them "that he would shoot them if they told anybody about the shooting." *Id.* Nevertheless, Scott told a third friend, Todd Jewell, about the murder. A week or two later, in early September, he also told Jewell that he "wanted to test drive a car and kill the owner." *Id.* Jewell protested, pointing out that Scott could steal a car without killing anyone.

On Friday, September 10, 1999, Scott, along with Jewell and Scott's girlfriend Kerry Vadasz, "saw a Ford Probe with a 'for sale' sign in the window parked in the front yard of Ryan Stoffer's [grandmother's house] in Canton, Ohio." *Id.* Scott wrote down the telephone number from the sign and again told Jewell that he planned to "call the owner, take the car for a test drive, have Vadasz drive, and shoot the owner from the back seat." *Id.* Scott made the arrangements, and Jewell drove him to meet Stoffer. The three men then took a test drive, but Scott did not attempt to kill Stoffer on this occasion. Instead, he told Stoffer that he would return because he wanted his girlfriend to see the car.

Two days later, Vadasz contacted Stoffer to set up a second test drive. Scott and Vadasz met Stoffer at his grandmother's house, and Stoffer's mother watched as he got in the car with Scott and Vadasz. Vadasz took the driver's seat, Stoffer sat next to her in the passenger seat, and Scott sat in the back. Vadasz then proceeded to drive "for the next hour and a half. As time passed, Stoffer provided directions on how to return to his grandmother's house, but ostensibly because Vadasz had little experience with driving a standard transmission, Scott told her to keep driving until she got used to it." *Id.* at 1138.

Eventually, Scott "removed a .22 caliber handgun from his pants pocket and placed it on the seat." *Id.* Scott later explained in his confession to police that, "'after about ten minutes, [he] just lifted [the gun] up and sat it back behind the head rest of [Stoffer's] chair. And just left it sittin' there for like two more minutes.' Scott then fired six shots into the back of Stoffer's head." *Id.*

Scott and Vadasz disposed of Stoffer's body, dumping it in a wooded area. Scott reacted to the murder by boasting to Jewell and another friend about the shooting, and by driving Stoffer's car to work the next day. Over the following week, however, police received an anonymous phone call linking Scott to Stoffer's death. They also obtained telephone records

showing that the Stoffer household had received a call from the residence of Anthony Scott, the petitioner's brother.  Scott was arrested, and Vadasz cooperated with the investigation by leading police to Stoffer's body and to the car.  Police located other physical evidence as well.

Ultimately, Scott confessed to Stoffer's murder, providing a detailed account to police. When asked about Green's murder, "[h]e initially denied any involvement but then blurted out, 'Okay, I did it,'" and again provided a detailed summary of the events.  *Id.* at 1139.

## B.  Procedural History

### 1.  *State Court Proceedings*

Scott was tried for the murders of both Green and Stoffer, and all other associated offenses, in one proceeding held in the Stark County Court of Common Pleas in the spring of 2000.  He was convicted and sentenced to death.  While the state presented Scott's confession, eyewitness testimony, and forensic evidence, Scott's counsel did not put forth any evidence during the guilt phase of trial, instead conceding that the evidence of guilt was overwhelming. *Id.*  Counsel did, however, call thirteen witnesses during the penalty phase and offered documentary evidence of various mitigating circumstances.  *Id.*  The jury found Scott guilty and recommended a sentence of death after concluding that three aggravating factors applied.  The court accepted this recommendation and sentenced Scott to death for Stoffer's murder, and to additional terms of imprisonment for his other convictions, including Green's murder and the aggravated robbery and kidnapping of Stoffer.  *Id.* at 1140.

Scott appealed to the Supreme Court of Ohio in May 2000.  Among other points, Scott argued that (1) the "course-of-conduct" aggravating circumstance was based on insufficient evidence and was against the manifest weight of the evidence; (2) the separate specifications for aggravated robbery and kidnapping were based on insufficient evidence and against the manifest weight of the evidence; and (3) Scott's trial counsel performed ineffectively by failing to object to certain evidence.  The court affirmed Scott's conviction and sentence in January 2004.  *Id.* at 1133, 1151.  One justice dissented on the basis that Ohio's course-of-conduct specification was unconstitutionally vague as applied, although Scott had not presented that argument to the court. *Id.* at 1151–52,  (Pfeifer, J., dissenting).

Next, Scott filed a petition for post-conviction relief in the Stark County Court of Common Pleas in January 2001. Scott again argued that his trial counsel was ineffective and also claimed that death by lethal injection violates the Eighth Amendment. The trial court denied Scott's petition; Scott appealed, and the Court of Appeals for the Fifth District affirmed. *State v. Scott*, No. 2005CA00028, 2006 WL 173171 (Ohio Ct. App. Jan. 23, 2006). The Supreme Court of Ohio declined jurisdiction over the appeal in June 2006.

Lastly, in April 2004, Scott sought relief in state court one final time through a proceeding known as a *Murnahan* or Rule 26(B) appeal,[1] which permits defendants to re-open their direct appeal if they can first show ineffective assistance of appellate counsel. Scott's *Murnahan* application alleged that his appellate attorney had committed several errors, including failing to argue that the course-of-conduct aggravating factor was unconstitutional under the Eighth and Fourteenth Amendments. In July 2004, the Supreme Court of Ohio summarily denied his application. *State v. Scott*, 811 N.E.2d 1148 (Ohio 2004) (table).

### 2. *Federal Habeas Proceedings*

Scott filed his habeas corpus petition in the Northern District of Ohio in June 2007, raising fifteen grounds for relief. The district court issued a memorandum opinion and order denying relief on all grounds, but then granted Scott a certificate of appealability to pursue his claim that trial counsel had provided ineffective assistance during the penalty phase. This court expanded the scope of the certificate to include the following additional claims:

1.  [W]hether the "course-of-conduct" aggravating circumstance sufficiently narrows the requirements for death penalty eligibility (Claim 4).

2.  [W]hether the trial court erred by failing to merge two capital specifications (Claim 11).

3.  [W]hether lethal injection is an unconstitutional method of execution (Claim 14).

The district court had jurisdiction over Scott's habeas petition pursuant to 28 U.S.C. § 2254(a), and this court has jurisdiction under 28 U.S.C § 2253.

---

[1] *See State v. Murnahan*, 689 N.E.2d 1021 (Ohio Ct. App. 1992), *appeal denied*, 678 N.E. 2d 1227 (Ohio 1997) (table).

## II.  ANALYSIS

### A.  Standard of Review and AEDPA

In an appeal from the denial of habeas relief, we review the district court's legal conclusions de novo and its factual findings for clear error.  *Adams v. Holland*, 330 F.3d 398, 400 (6th Cir. 2003).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires courts to deny habeas relief to a claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court.  28 U.S.C. § 2254(d).  A state court decision is contrary to law as established by the Supreme Court if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under AEDPA, a state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of showing, with clear and convincing evidence, that a court's factual conclusions were unreasonable.  *Id.*

Moreover, a habeas petitioner typically must show that he has exhausted all available state-court remedies and that his arguments are not procedurally defaulted.  A claim will be considered procedurally defaulted, and therefore unreviewable, if the petitioner fails to present the claim in state court, or if he attempts to present the claim but it is dismissed due to his failure to comply with a state procedural rule that serves as an "independent and adequate ground[] for precluding relief." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Procedural default, however, may be excused if the petitioner can show cause for the default and prejudice resulting from it.  *Id.*  If a state court has not decided a particular claim on the merits, and if that claim is not procedurally defaulted, AEDPA deference does not apply, and "this court [will] review[] questions of law and mixed questions of law and fact de novo." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

## B. Constitutionality of Ohio's "Course-of-Conduct" Aggravating Specification

Under Ohio law, an individual convicted of aggravated murder may not be sentenced to death unless at least one aggravating factor applies and the jury concludes that it has been proven beyond a reasonable doubt. Ohio Rev. Code § 2929.04(A). Three aggravating specifications are relevant to this case. The first reads as follows:

> Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar *was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons* by the offender.

*Id.* § 2929.04(A)(5) (emphasis added).

Scott argues that the course-of-conduct aggravating factor, as applied to the facts of his case, fails to adequately narrow the class of death-eligible defendants as required by *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Godfrey v. Georgia*, 446 U.S. 420 (1980). The district court concluded that because Scott had not raised this claim on direct appeal and could not raise it thereafter, it is procedurally defaulted. Still, the court evaluated the merits and determined that the aggravating circumstance passed constitutional muster. We agree that this claim is procedurally defaulted and do not consider the merits.

In state proceedings, Scott presented two different arguments pertaining to the course-of-conduct aggravating factor. Both are distinct from the claim he raises here. First, on direct appeal, Scott argued that the jury had insufficient evidence to apply the aggravating factor. Second, in an application to re-open his direct appeal, also known as a *Murnahan* application, Scott claimed that his appellate counsel had performed ineffectively by failing to argue that the course-of-conduct aggravating factor was unconstitutional. Scott now relies on these proceedings to argue that his course-of-conduct claim is properly before this court. He is wrong, however, because neither of these instances preserved the claim Scott presents in his habeas petition.

To be eligible for relief under § 2254, a state prisoner typically must first pursue the "same claim[s] under the same theory" in state court. *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009). The claim that Scott made on direct appeal does not meet this requirement, as an

argument that the jury had insufficient evidence to apply the course-of-conduct aggravating factor is substantively distinct from an argument that the factor itself is unconstitutionally broad or vague. *See, e.g., Rayner v. Mills*, 685 F.3d 631, 643 (6th Cir. 2012); *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987).

After neglecting to attack the constitutionality of the aggravating factor on direct appeal, Scott then raised it in his application for a *Murnahan* proceeding under Ohio Rule of Appellate Procedure 26(B). On several occasions, however, this court has held that a *Murnahan* application "cannot function to preserve the underlying substantive claim" for habeas review. *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) (internal quotation marks omitted); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 338 (6th Cir. 2012); *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005). *Murnahan* proceedings permit criminal defendants to apply to reopen their appeals "based on a claim of ineffective assistance of appellate counsel." Ohio R. App. P. 26(B); *see also* Ohio Sup. Ct. Prac. R. 11.06. In his or her application, the defendant must identify "[o]ne or more assignments of error . . . that previously were not considered on the merits in the case by any appellate court or that were considered on an incomplete record because of appellate counsel's deficient representation." Ohio R. App. P. 26(B)(2)(c). The application will be granted if the court finds a "genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." Ohio R. App. P. 26(B)(5). Once an application has been granted, the court will vacate its prior judgment and issue a new judgment if it concludes that counsel's performance was deficient and prejudiced the defendant. Ohio R. App. P. 26(B)(5) & (9). Thus, by the text of the Ohio rules, *Murnahan* proceedings allow defendants to re-open their appeals and raise new substantive claims *only* if their failure to raise these claims in the first instance was due to ineffective assistance of their appellate counsel. *See Wogenstahl*, 668 F.3d at 338. The Supreme Court of Ohio denied Scott's application to re-open his appeal, evidently finding that Scott had not made a threshold showing of ineffective assistance. *See State v. Scott*, 811 N.E.2d 1148 (Ohio 2004) (table).

Ultimately, Scott failed to present his course-of-conduct claim to the state courts, and he is no longer able to seek relief there due to Ohio's filing deadlines as well as its res judicata rules. *See* Ohio Rev. Code § 2953.21(A)(2) (postconviction relief); *Hanna v. Ishee*, 694 F.3d

596, 613–14 (6th Cir. 2012) (res judicata).  As a result, this claim is procedurally defaulted.  *See Anderson*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999), and *Engle v. Issac*, 456 U.S. 107, 125 n.28 (1982)).  Scott does not argue cause for the default or that it resulted in prejudice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).  The district court properly denied relief on this claim.

## C.  Trial Court's Failure to Merge Two Aggravating Specifications

Scott also argues that the trial court improperly failed to merge two statutory aggravating specifications, one relating to robbery, and the other to kidnapping, on the basis that no separate animus existed to support the kidnapping offense.  *See* Ohio Rev. Code § 2929.04(A)(7) (listing, as aggravating specifications, that "[t]he offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping . . . [or] aggravated robbery").  Because Ohio law requires fact-finders in a capital case to weigh mitigating circumstances against aggravating ones, *see id.* § 2929.03(D)(2), Scott argues that the application of these two separate factors, rather than one, improperly tilted the scales in favor of the death penalty.

Scott presented a part of this claim on direct appeal, where he argued that there was insufficient evidence to find that both the aggravating circumstances for kidnapping and for robbery applied beyond a reasonable doubt.  The Supreme Court of Ohio rejected this argument on the merits, noting that Scott admitted to detaining Stoffer in the car for an hour and a half, far longer than necessary to kill him and steal the vehicle, while ignoring Stoffer's attempts to return to his grandmother's house.  *See Scott*, 800 N.E.2d at 1140–41 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979), as well as Ohio cases).  The state court's conclusion is therefore subject to AEDPA deference, and Scott cannot obtain relief unless the state court ignored or unreasonably applied "clearly established Federal law" as determined by Supreme Court precedent or made an "unreasonable determination of the facts in light of the evidence" available to it.  28 U.S.C. § 2245(d).

The claim Scott makes in his habeas petition is, however, not identical to the one he pursued on direct appeal.  Rather than rely solely on the sufficiency-of-the-evidence standard, Scott also draws on two separate lines of federal cases pertaining to the narrowing function of

statutory aggravating circumstances and double jeopardy, which he posits all overlap in such a manner as to require the merger of his aggravating specifications for robbery and kidnapping. (Pet'r's Br. at 58–66.)  Because this argument differs from the one he presented on direct appeal, it is not immediately clear whether the district court correctly determined that this claim had been preserved for habeas review.  *See Wagner*, 581 F.3d at 417.  We need not consider this question, though, because the district court properly denied relief on the merits.  *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) (declining to consider merits where the procedural default issue is "complicated" and "unnecessary to [the] disposition of the case").

Scott's argument cannot succeed because he does not cite any precedent from the United States Supreme Court indicating that two or more aggravating factors must be merged when they are based on the same underlying conduct.  *See Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) ("Under AEDPA, if there is *no* clearly established Federal law, as determined by the Supreme Court" that supports a petitioner's argument, "the argument must fail." (internal quotation marks omitted)).  To the extent that Scott claims there was insufficient evidence to apply both factors, the Supreme Court of Ohio rejected this argument, and its conclusion was not an unreasonable interpretation of the facts or the law.  *See Jackson*, 443 U.S. at 324.  The remainder of Scott's argument amounts to a request that we recognize a federal rule akin to Ohio's merger doctrine and apply it to the penalty phase of a capital trial.  *See State v. Jenkins*, 473 N.E.2d 264, 292–97 (Ohio 1984).  But AEDPA's restrictive standard of review does not permit us to fashion a new rule by extending existing precedent to an entirely new context.  *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (rejecting petitioner's argument that because the state court was constitutionally required to give an adverse-inference instruction at the guilt phase of trial, it was also required to do so at the penalty phase).  Scott cannot obtain relief on this claim, and the district court correctly rejected it.

**D.  Ineffective Assistance of Trial Counsel**

Next, Scott argues that his trial counsel provided ineffective assistance during the penalty phase of his trial in two ways: first, by mistakenly advising Scott that if he made an unsworn

statement to the jury, the prosecution could encourage the jury to draw negative inferences from his decision not to testify under oath; and second, by failing to present certain mitigating evidence regarding Scott's childhood experiences with his adoptive family, with whom he lived from the age of about ten until eighteen.  The state courts considered both claims on the merits.  Although Scott did not present an argument regarding the unsworn statement on direct appeal, the Supreme Court of Ohio nevertheless raised and rejected it sua sponte.  *See Scott*, 800 N.E.2d at 1145.  Scott did bring his claim regarding the mitigating evidence in post-conviction proceedings, and it too was rejected.  *See Scott*, 2006 WL 173171, at *4–5.

AEDPA therefore applies to both claims of ineffective assistance.  This is the case even though the state court rejected both claims with only a cursory analysis of the applicable law.  *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation," § 2254(d) still applies, and "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

Under the strictures of AEDPA, it is notably difficult to succeed on a claim of ineffective assistance of counsel.  Scott must show not only that his trial counsel's performance was deficient, but also that it prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if it falls "below an objective standard of reasonableness."  *Id.* at 688.  But "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and it is the petitioner's burden to show that this is not the case.  *Id.* at 689.  Moreover, to demonstrate prejudice, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  This, too, is a heavy burden, as counsel's deficiencies must have been "so serious as to deprive the defendant of a fair trial."  *Id.* at 687.  Ultimately, a federal court cannot grant habeas relief on an ineffective assistance claim simply because it disagrees with the state court's analysis.  "[T]he question is not whether counsel's actions were reasonable," but "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 131 S. Ct. at 788 (emphasis added).

*1. Erroneous Advice Regarding Unsworn Statement*

In Ohio, a defendant in a capital case may make a statement to the jury without taking an oath or affirmation and without being subject to cross examination. Ohio Rev. Code § 2929.03(D)(1). If a defendant opts to do so, the prosecutor may comment on the unsworn statement, but only to remind jurors that the statement was not given under oath. *See State v. DePew*, 528 N.E.2d 542, 554 (Ohio 1988). Scott's trial counsel either misunderstood or miscommunicated this standard and erroneously warned Scott that, if he gave an unsworn statement, the prosecutor could instruct jurors to draw an adverse inference from it. Thus, on direct appeal, the Supreme Court of Ohio observed that Scott's attorney had "misadvised" him. *Scott*, 800 N.E.2d at 1145. We need not consider whether counsel's conduct was deficient, however, because Scott has failed to demonstrate prejudice.

Scott argues that counsel's poor advice deprived him of an opportunity to accept responsibility for his acts and add evidence of mitigation. Although this amounts to an argument that he was prejudiced, it is not persuasive for two key reasons. First, Scott conceded guilt at the outset of trial, *id.* at 1144, and had therefore already acknowledged responsibility. Second, in the penalty phase, Scott presented extensive mitigating evidence regarding his personal life, including abuse he suffered during his early childhood. *Id.* at 1146–47. It is therefore unlikely that Scott's sentencers would have reached a different conclusion had they heard an unsworn statement that merely reiterated what they already knew. Scott does not identify any particular piece of mitigating information that he wished to share with the jurors and of which they were not already aware. Thus, in concluding that counsel's mistaken advice did not meet the *Strickland* standard, the state court could have reasonably determined that Scott could not show prejudice. *Richter*, 131 S. Ct. at 788.

*2. Failure to Present Mitigating Evidence*

Scott also contends that his trial counsel was ineffective for failing to present certain mitigating evidence regarding his experiences with his adoptive parents, Fred and Bettie Scott, whom he claims were abusive. Although Scott concedes that his attorneys "did more than a cursory investigation" to prepare for the penalty stage of his trial, he argues that they failed to discover and develop evidence pertaining to the years he spent with the Scott family. (Pet'r's Br.

at 38.)  Scott claims that three witnesses were available to testify on this subject—two of whom in fact *did* testify at the penalty phase, but on topics other than the Scott family, and one of whom did not testify at all.  In his petition for post-conviction relief from the state court, Scott presented affidavits from these three individuals.  *Scott*, 2006 WL 173171, at *4–5.  The state court conducted a de novo review of the affidavits and concluded that Scott's trial counsel was not ineffective under the *Strickland* standard for failing to put forward the evidence they contained.  *Id.*

Although *Strickland* remains the overarching standard for ineffective-assistance claims, the Supreme Court has further clarified what *Strickland* means in the particular context of mitigation proceedings.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams*, 529 U.S 392.  Defense attorneys in capital cases have a responsibility to investigate their client's background and to consider mitigating evidence.  *See Williams*, 529 U.S. at 396. The scope of the investigation required will vary from case to case, however, and a limited investigation is not necessarily deficient so long as "reasonable professional judgments support" counsel's decision not to investigate further.  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 691); *see also Burger v. Kemp*, 483 U.S. 776, 794–95 (1987).

*Wiggins v. Smith* illustrates the sort of conduct that the Supreme Court considers deficient.  In that case, defense counsel neglected to investigate thoroughly their client's personal life and therefore failed to present evidence that he had suffered severe physical and sexual abuse throughout his upbringing.  539 U.S. at 516–18.  Counsel did, however, conduct some investigation and had reviewed a presentence report and social services records—both of which *should have* alerted them to possible abuse and prompted them to dig deeper.  *Id.* at 523–25.  The Supreme Court granted relief, rejecting the state court's reasoning that counsel knew of Wiggins's "unfortunate childhood" but made a strategic choice to defend the case by arguing that he was not wholly responsible for the murder.  *Id.* at 518.  Because "counsel chose to abandon their investigation at an unreasonable juncture," the reviewing court should not have deferred to their judgment.  *Id.* at 527–28.  With this example in mind, we consider the evidence that was, and was not, presented at Scott's trial.

*Evidence presented at Scott's penalty phase.* Scott's trial counsel presented thirteen witnesses in total, ranging from family members to therapists and social workers. One of the most important witnesses was Julia Mae Williams, Scott's birth mother, who had custody of Scott until he was about five years old. On the stand, Williams admitted to abusing Scott and to suffering from drug and alcohol addictions during his early childhood. Her testimony was corroborated by a social worker who worked with Scott and Williams at the time, and by Patrice Turner, a friend and former neighbor who repeatedly witnessed Williams's abusive behavior. According to Turner, Williams consistently called Scott names, told him "she didn't want him," struck him to the point of bruising him, and burned him with cigarettes.

A social worker and mitigation specialist also testified as to Scott's childhood as a whole, based on his interviews with Scott, his relatives, and other people who knew him. Additionally, two psychologists took the stand, one of whom treated Scott when he was about ten or eleven years old, and the other of whom examined Scott shortly before trial and diagnosed him with depression and alcohol and cannabis dependency.

Lastly, Scott's adoptive parents, Fred and Bettie Scott, described their decision to adopt Scott, his transition into their household, and the behavioral problems he began to display as a teenager. Both explained that they still loved Scott and continued to view him as part of their family. Two of Scott's siblings, who also had been adopted by the Scott family, offered similar testimony.

Overall, the mitigation evidence depicted the Scotts as caring and well-intentioned but unusually strict, especially in regard to their religious views, which Scott never fully espoused. The jury heard that Scott experienced difficulty integrating into the household but that he spent several uneventful years there, until he began to distance himself from the Scott family around the age of seventeen.

*Evidence not presented at Scott's penalty phase.* Notwithstanding the above testimony, Scott argues that his trial counsel was ineffective for failing to introduce additional testimony regarding his time living in the Scott household. In post-conviction proceedings, Scott submitted three affidavits describing evidence that he believes counsel should have presented.

The first affiant, Eric Calloway, lived in the Scott household as a foster child during an undisclosed period. Nothing in Calloway's affidavit indicates that he lived with the Scotts at the same time as the petitioner, though, or that Calloway had any first-hand information about the petitioner's experience with them. Still, Calloway stated that during his time with the Scotts, they required their foster children to do difficult household chores that were never assigned to their biological children. Calloway further claimed that the Scotts beat their foster children with machine belts when they did not complete chores satisfactorily, and that they forced him to participate in religious activities and prohibited him from playing with children who were not Jehovah's Witnesses, as they were.

The second affiant, Patrice Turner, had testified at Scott's penalty phase regarding his early childhood with his biological mother. Her affidavit, however, included information that she had not presented at trial. Turner stated that, like Scott, she had lived with Katherine Wilson—Scott's first foster mother, who cared for Scott from ages five to ten—but that, around age twelve, she was moved from Wilson's home to the Scotts' home. She described the Scott household as "so bad that [she] ran away." According to Turner, the Scotts' foster children were required to cook meals and clean the house, while their other children were not, and were forced to attend church services. Turner further opined that "the Scotts did not offer a warm and loving home" and may have provided foster care "for the money." Lastly, Turner noted that she had provided this information to Scott's trial counsel but that they did not use most of it. It seems that Turner's time in the Scott household preceded the petitioner's by several years. *See Scott*, 2006 WL 173171, at *5 (noting that the petitioner "was not placed in the Scott home until well after Ms. Turner had become an adult and had gotten married").

The third affiant, Lisa Hall, had also testified at Scott's penalty phase, likewise on different subjects than her affidavit addressed. Hall too was a former foster child. Hall explained that she had lived with Scott in the home of Katherine Wilson, Scott's first foster mother, and continued to have some contact with Scott after he was moved to the Scotts' home. According to Hall, Scott did not like his new adoptive parents and the "different environment" they provided. Hall's affidavit did not comment on any abuse in the Scott household, but it did

state that the Scotts would not celebrate birthdays or other holidays due to their religion, and that they forced Scott to proselytize with them.

   *Ineffective-assistance analysis.*  Scott has not shown that he is entitled to relief under the *Strickland* standard.   Defense counsel presented thirteen mitigation witnesses with varying credentials and points of view, who collectively fashioned a detailed account of Scott's terribly difficult childhood and shed light on his transformation into a troubled adult.   On these facts, we cannot conclude that the state court unreasonably denied Scott's claim that trial counsel was deficient.   Although the opinion rejecting this claim did not thoroughly explain the court's reasoning, *see Scott*, 2006 WL 173171, at *4–6, the court could have reasonably concluded either that counsel's performance was adequate or that Scott could not show prejudice, or both. *See Richter*, 131 S. Ct. at 784.

   First, as the above summary demonstrates, Scott's counsel conducted a reasonably thorough investigation—one that, at the very least, complied with the requirements of *Wiggins* and *Strickland*.  Scott does not identify any important source of information that counsel failed to consult.  Of the three individuals who submitted affidavits in support of Scott's post-conviction claims, only one, Eric Calloway, had not participated in Scott's mitigation proceedings. Calloway's affidavit, however, is of only limited relevance, given that he did not identify when exactly he lived with the Scott family, and he offered nothing to suggest that his time there overlapped with Scott's.

   The state court also could have concluded that counsel's decision not to offer further testimony about the Scott household was sound trial strategy.  As Patrice Turner stated in her affidavit, Scott's attorneys knew that Turner's experience with the Scott family was less than idyllic, but they did not question Turner about this on the stand.  Scott's attorneys may well have chosen to depict the Scotts as kind and loving because they were willing to testify that they still cared for Scott and thought of him as their son—thereby humanizing him.   This theory is supported by counsel's closing statement, which argued that Scott was "irreparably damaged" by his mother's abuse, and that even his adoptive family, "these good people[,] couldn't undo what had been done."

Moreover, Scott has not demonstrated that any of defense counsel's alleged oversights were prejudicial to his defense. While Scott argues that his attorneys failed to present evidence that the Scott family mistreated him, they did present *extensive* evidence of his biological mother's abusive behavior, which was by all accounts far more severe than anything described in Calloway's or Turner's affidavits regarding the Scott family. Several mitigation witnesses described the horrific abuse that Scott suffered at the hands of his mother during his first four years of life. Pictures were presented, documenting his physical injuries. And still this evidence did not convince the jury to choose a life sentence.

Scott argues that, by depicting his adoptive parents as kind, loving people, Scott's trial counsel in fact supported the prosecution's penalty-phase theory—that Scott had a chance to reform himself but chose not to take it, and was therefore culpable for his actions. But, even accepting this argument as true, we cannot grant relief unless there are no reasonable grounds upon which the state court could have denied Scott's ineffective-assistance claim. *Richter*, 131 S. Ct. at 788. It would not be unreasonable to conclude that evidence of harsh or even abusive conditions in the Scott household would have failed to sway a jury that did not find Scott's deplorable childhood—plagued by physical brutality and emotional abuse—sufficiently mitigating to spare him the death penalty. Because the state court's denial of Scott's claim was not unreasonable, this court must deny relief.

**E. Constitutional Challenge to Lethal Injection**

As his final claim for relief, Scott argues that death by lethal injection is cruel and unusual in violation of the Eighth Amendment and violates his Fourteenth Amendment right to due process. Scott's petition alleges that lethal injection "inflicts torturous, gratuitous and inhumane pain, suffering and anguish upon the person executed." He concedes that the United States Supreme Court has upheld the use of lethal injection but argues that in *Baze v. Rees*, 553 U.S. 35 (2008), the Court acknowledged that "the implementation of the *method of execution* could implicate the Eighth Amendment." (Pet'r's Br. at 66 (emphasis added).) The district court concluded that this claim was not procedurally defaulted, addressed it on the merits,

and denied relief.**2**    On appeal, Scott does not present a substantive argument about lethal injection, but rather requests that we remand this claim for further development in the district court.

As Scott's counsel acknowledged at oral argument, Scott is a party in ongoing litigation, brought under § 1983, to challenge the constitutionality of Ohio's execution procedures.  *See* Docket, *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-01016-GLF-MRA (S.D. Ohio) (Frost, J.).    Counsel argued, however, that the relief Scott seeks from this court could not be obtained through the protocol litigation, because Scott seeks to challenge the validity of his sentence—an argument confined to habeas—and not merely the conditions of his confinement—an argument cognizable under § 1983.  *See Adams v. Bradshaw*, 644 F.3d 481, 482–83 (6th Cir. 2011) (citing *Hill v. McDonough*, 547 US. 573 (2006), and *Nelson v. Campbell*, 541 U.S. 637 (2004), and distinguishing between lethal-injection claims brought under § 2254 and § 1983).  Scott's petition supports this characterization of his claim.  It asserts that because lethal injection cannot be administered in a constitutional manner, his "death sentence must be declared void." (Pet. for Writ, R. 12, PageID 125.)

Although we understand Scott's point—that the relief he seeks is available only through a federal habeas claim—we decline to grant Scott's request for a remand.  As the law currently stands, there is no merit to Scott's assertion that his sentence is void because lethal injection is unconstitutional.  Simply put, lethal injection does not violate the Constitution per se, and Scott

---

**2**Scott first raised this claim in his petition for post-conviction relief; he did not bring it on direct appeal. As a result, the trial court handling his post-conviction petition rejected it as res judicata and declined to reach the merits.  The Ohio Court of Appeals affirmed.  *See Scott*, 2006 WL 173171, at *6.

Scott again raised this claim in his federal habeas petition.  He then moved the district court to certify to the Supreme Court of Ohio "the question of whether there exi[s]ts a postconviction forum to litigate the issue of Ohio's lethal injection protocol."  The federal court granted Scott's motion and certified the question.  The Supreme Court of Ohio answered that "[t]here is no state postconviction relief or other state-law mode of action to litigate the issue of whether a specific lethal injection protocol is constitutional under *Baze v. Rees . . .* or under Ohio law."  *Scott v. Houk*, 939 N.E.2d 835, 836 (Ohio 2010).  A concurrence further noted that this issue could be brought in a *federal* action under § 1983.  *Id.* at 838 (Lundburg Stratton, J., concurring).

In light of the Supreme Court of Ohio's own admission that Scott could not pursue this claim in any state forum, we do not consider it procedurally defaulted due to Scott's failure to raise it on direct appeal.  Any attempt to do so would clearly have been futile.  *See Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005) ("[A] habeas court should excuse exhaustion where further action in state court would be an exercise in futility." (internal quotation marks omitted)); *see also* 28 U.S.C. § 2254(b)(1) (writ can be granted where "there is an absence of available State corrective process").  Moreover, AEDPA deference does not apply because the state court did not consider this claim on the merits.  *See Scott*, 2006 WL 173171, at *6 (rejecting the claim on procedural grounds).

acknowledges as much in his brief. *See Baze v. Rees*, 553 U.S. 35; *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009). Therefore, in order to obtain relief from his sentence, Scott would first have to gather facts showing that Ohio is unable to administer lethal injection in a constitutionally permissible manner. And this is precisely the type of discovery that Scott can pursue in his § 1983 litigation.

We are assured that Scott's death sentence will not be carried out if, and so long as, a federal court determines that Ohio is incapable of doing so in accordance with the law. The district court properly denied this claim.

### III. CONCLUSION

Whatever one may think of Scott's actions, the state courts' treatment of his legal claims, and his death sentence, this court cannot provide the relief Scott seeks. In reviewing the habeas petition of a state prisoner, our role is not to second-guess or supplant the state courts that preceded us. We therefore affirm the district court's denial of relief.