RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MELVIN WOFFORD,

*Petitioner-Appellee,*

> No. 18-2367

*v.*

JEFFREY WOODS, Warden,

*Respondent-Appellant.*

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-13083—Laurie J. Michelson, District Judge.

Argued: October 17, 2019

Decided and Filed: August 13, 2020

Before: BOGGS, BATCHELDER, and DONALD, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** David Porter, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Colleen P. Fitzharris, FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellee. **ON BRIEF:** David Porter, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Colleen P. Fitzharris, FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

BOGGS, Circuit Judge. The right to "trial by an impartial jury" guaranteed by the Sixth Amendment contains certain substantive requirements. *Ramos v. Louisiana*, 590 U.S. ___, 140

S. Ct. 1390, 1395 (2020).  One of these is the rule, established since the Middle Ages, that the trial judge cannot remove a juror based on that juror's opinion of the merits of the case.  Yet at the same time, trial judges have long-established power, consistent with the Constitution, to remove jurors for misconduct.  This case concerns what happens when a trial judge removes a juror for misconduct when that juror is also a holdout against conviction.

Wofford was found guilty of murder in a Michigan court following the removal and replacement of a juror.  While that juror was holding out against conviction at the time, the judge removed her because of her misconduct: she had violated his instructions not to discuss the case with anyone other than her fellow jurors by hiring a lawyer to address the court about the tensions in the jury room.  The Michigan Court of Appeals (MCOA) affirmed Wofford's conviction under a state precedent on juror removal.  A federal district court then granted Wofford's petition for a writ of habeas corpus.  The district court held that the MCOA's decision was not entitled to deference under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because the Michigan court had overlooked Wofford's Sixth Amendment claims.  Second, it held that the removal of the juror violated Wofford's Sixth Amendment rights.

In assessing this appeal, we first review the factual determinations that the federal district court made in reviewing the factual findings of the MCOA.  This review shows that, while the juror was a holdout, she was not removed for this reason, but instead because of her misconduct.

Then, we turn to review whether the district court was legally correct in granting a writ of habeas corpus on these facts.  The recent Supreme Court decision in *Ramos* provides guidance on the Sixth Amendment right at the center of this case: the right not to have a juror removed due to the juror's opinions on the merits of the case is contained in the Sixth Amendment's guarantee of a "trial by an impartial jury."  *Cf.* 140 S. Ct. at 1395.  We review first the history and limits of this right and then the different ways in which Michigan courts and certain federal courts have attempted to protect it.  This history makes it clear that Michigan did not overlook Wofford's Sixth Amendment claims.

This is a case of first impression in this circuit. Many of our sister circuits, on direct appeal, and some states have applied a prophylactic rule, holding that where there is a "reasonable possibility" that the removal decision stems from the juror's views on the merits of the case, such removal is impermissible and is grounds for reversal of a conviction and a new trial. *See, e.g.*, *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999). But the Supreme Court has held that the state courts are not bound by the federal appellate courts' decisions on constitutional questions. *See Johnson v. Williams*, 568 U.S. 289, 305 (2013). Here, the MCOA was therefore free to require a showing of an actual constitutional violation. Implicitly but clearly, it did so. As a result, we reverse.

## I. Factual and Procedural History

### A. The Murder

In June 1993, Thomas Gilmore was strangled to death outside of his employer's offices late at night. Gilmore, a surveyor, worked for a company located in a building that also contained a roofing company. Police found evidence suggesting that a person or persons familiar with the interior layout of the roofing company had broken into it, stolen a circular saw, and attempted to force open an inner office where more valuable equipment and cash were kept. The point of entry appeared to be a previously broken window that was covered with sheet metal held up by duct tape and screws. Police found two hairs stuck to the duct tape that held the sheet metal in place and, on a wall and work bench, two droplets of blood that they suspected came from the burglar after he cut himself on some of the broken glass while entering.

The police theorized, and prosecutors would later argue, that Gilmore had an encounter with the person(s) involved, either while taking a break outside from his late-night work (as he sometimes would) or after he was lured outside. Gilmore had been beaten severely and then strangled with a rag or piece of clothing. Gilmore's assailant used the handle of a hammer, taken from the roofing company, either in Gilmore's beating or to assist in his strangulation, or both. As evidence suggested a period of time between the beating and the killing, police posited that the burglar realized that Gilmore would recognize him and thus killed Gilmore to ensure his silence. Yet for over two decades, the case lay cold. Then, due to advances in DNA technology,

the state was able to match the hair and the blood to Melvin Wofford, who was an employee of the roofing company at the time of the murder.

## B.  The Trial

Wofford was tried for murder in a Michigan state court in August 2013.  The prosecution not only relied on the physical evidence and deductions outlined above but also introduced evidence that Wofford had needed money for a drug habit and that the roofers' pay had recently been delayed by the company.  A former coworker testified that Wofford had been out drinking with him on the night of the murder but mysteriously disappeared at about 3 A.M., only to reappear the next morning sleeping in the coworker's living room.  Moreover, witnesses said that Wofford did not return to work the day after the murder or the day following, and may have never returned again.  As some of the evidence at the scene of the crime did not point to Wofford, the prosecution offered a theory in the alternative that he had had an accomplice.

The defense relied primarily on raising points of reasonable doubt.  The initial investigation of the burglary had been sloppy, as it was at that time a low-priority crime; Gilmore's body was not discovered, hidden in the bushes outside, for another 24 hours after the break-in was reported.  By the time the body was discovered, the crime scene was contaminated. The defense argued that it was natural for some of Wofford's blood to be in a place where he worked with sharp tools and construction equipment, and that he could easily have shed some of his "long blond hairs" while working, which subsequently were carried by the air and got stuck in tape.  The prosecution countered with testimony indicating that the blood droplets were fresh and invited the jury to observe that nothing else, not even dust, was attached to the duct tape, which implied that it had been freshly torn from the metal that covered the window when the hairs stuck to it.  The defense further argued that only a used circular saw worth $30 had been stolen, and the burglary would thus have been a misdemeanor; therefore, concealing his identity would be a poor motive for the burglar to commit murder.  Because Gilmore had been so badly beaten, the defense inferred that he must have fought back.  Yet Wofford's coworker testified that he was in the same clothes the next morning as the night before, which did not appear bloody or torn, and witnesses who saw Wofford in the days after the murder did not recall seeing bruises on his hands or face.  Nor was his blood identified among the samples taken from

Gilmore's body.  Finally, the defense pointed to two sets of alternative suspects:  another tenant of the building with a history of violence, to whose son Gilmore owed money, and two men who had been convicted of a burglary and murder in a nearby town at around the same time.

> When the judge swore the jury at the beginning of the case, he instructed them that:

> You must not discuss the case with anyone, including your family or friends.  You must not even discuss it with the other jurors until the time comes for you to decide the case.  When it is time for you to decide the case I will send you to the jury room for that purpose.  Then you should discuss the case among yourselves but only in the jury room and only when all the jurors are there.  When the trial is over you may, if you wish, discuss this case with anyone.

Trial lasted for nine days spread over three weeks.  At the end of each day, the judge reminded the jurors not to talk to anyone else about the case.[1]  Instructing the jury at the end of the trial, the judge told them, "you must decide this case based only on the evidence admitted during the trial."  He reminded the jury that "all the cautionary instructions I've given you . . . would continue to apply, so keep an open mind, not discuss [sic] the case with anyone else[,] have no dealings with anybody."  The jury began deliberating on the afternoon of Friday, August 23.

On Monday, August 26, after the jury had been deliberating for about seven total hours, the jury foreperson sent a note to the judge, reading, "We are eleven to one with no chance of the one moving their view."  The judge consulted with the lawyers for both sides, gave the jury a deadlock instruction, and sent them back to continue deliberating.  Just an hour after he sent them back in, his clerk received a note from another juror (not the foreperson):  "Excuse me, judge, one of our jury's [sic] doubts are unreasonable, what do we do?"  The judge did not respond directly.  Instead, realizing that the jury may not have been given a standard instruction, he summoned the jury and read them the following:

---

[1]*E.g.*:

[Y]ou must not discuss this case with anyone or let anyone discuss it with you or in your presence. You must resist your human impulses and human nature and not discuss the case with family, friends or strangers.  If someone tries to discuss the case with you please tell him or her to stop.  If they continue, leave and report the incident to me when you return to the court.

You must not talk to the defendant, the lawyers or the witnesses about anything at all, even if it has nothing to do with the case.  Remember, the only information you receive about this case is when you're in the court, when you're acting as the jury, when the defendant, the lawyers and I are all here.

> If you want to communicate with me while you're in the jury room please have your foreperson write a note and give it to the court clerk. It is not proper for you to talk directly with the Judge, lawyers, court officers or other people involved in the case. As you discuss the case you must not let anyone, even me, know how your voting stands. Therefore, until you return with a unanimous verdict do not reveal this to anyone outside the jury room.

Neither of these notes revealed the gender of the juror referred to. Nothing further of note happened that day.

The next morning (Tuesday) was quiet. Then, in the mid-afternoon, the jury sent three notes to the judge within the space of half an hour. The first read:

> We the jury have a member who is not cooperating and refuses to deliberate or prove to us her vote. She just wants a hung jury. She also stated she had looked up the phrase to see what it meant before deliberation even started.
>
> Please advise us on what to do in this case.
>
> Thank you!

The second said:

> We Have a Jury member who SERIOUSLY doesn't understand what Reasonable Doubt is!! We have a hung jury and we need instructions!!!
>
> Help!!!

The third note, meanwhile, asked a question about the law of aiding and abetting.[2] At this point, the court heard from both counsel. The prosecution suggested that the juror referenced in the second note should be removed for cause, because by doing outside legal research she had violated her oath. Alternatively, he argued, the jury should be given the deadlock instruction again.

At this point, the defense attorney made a mistake. Operating without a transcript, he mistakenly 'recalled' that one of the previous day's notes had referred to the holdout juror by a masculine pronoun (it had not, speaking only of "one of our jury's [sic] doubts"). Thus, he concluded that the use of "she" in the first note that day meant that the composition of the jury's

---

[2]"Can you explain to us why, if someone commits robbery, why are they [sic] considered guilty of murder, example get-away driver."

vote had changed since the original note. Therefore, he equivocated as to whether the court should declare a mistrial or reread a deadlock instruction. The misperception thus created would continue to plague the proceedings.

The judge decided to give a series of instructions to the jury: an aiding-and-abetting instruction, a reasonable-doubt instruction, an instruction not to seek outside information and to follow the law, and a second deadlock instruction. The defense made no objection. Thus ended the third full day of deliberations. On Wednesday—on the afternoon of which the judge was unavailable—nothing more came out of the jury room (aside from a request to see an item of evidence).

Just before noon on Thursday, an attorney presented himself in court and said that he had been hired by one of the jurors, Juror M. He explained that his client had contacted him the evening before:

> She said that she needed my help and that she was being harassed and verbally abused on a jury that she was sitting on. And we didn't discuss any of the facts of the case or discuss anything about a vote or anything like that, I just advised her that she should notify the Court through a note to the bailiff . . . . And then, you know, later on I talked to her . . . I said look, if you're uncomfortable . . . it was obvious she was uncomfortable . . . I said, you give me permission, I can notify the Court, and after several discussions last night she instructed me to notify the Court.
>
> . . . .
>
> I didn't know any of the facts. I don't—other than what was advised to me while we were in the hallway by Mr. Lynch [defense counsel], so I know nothing about the case other than what Mr. Lynch had told me, and of course, none of that had—had been or has been discussed with [Juror M].

The court asked both counsel why he should not dismiss the juror for cause, as contacting the lawyer was "a flagrant violation of the Court's instructions, cautionary instructions, which were not to discuss the case at all with anyone outside of the jury room . . . ." "Let's say she said and it's eleven to one or gone in detail, I think that would be certainly cause to excuse her from the jury without a blink of an eye." Even assuming that Juror M had said nothing about the substance of the case, her discussion of "the climate of the jury room" may well "constitute[] cause to excuse her."

The defense at this point requested that the judge declare a mistrial on the grounds that replacing the juror would mean "there's going to be issues whether it's a coercive verdict."**3** The prosecutor argued that the juror had "violated the [c]ourt's order" and that the defense request for a mistrial was "based on just speculation" as to where things stood with the jury. On the other hand, the prosecutor also said that it would accept a mistrial as proper, as long as it were for 'manifest necessity,' so as to allow for retrial: "our position is, at this point, that a mistrial is proper, so we join in that." Just then, the confusion over whether there had been one holdout or two raised its head again. The judge reasoned that:

> [I]f I agree . . . that we don't know what the jury is doing, but also agree that there's been a violation -- juror misconduct in contacting a lawyer, why isn't the proper remedy to excuse her for cause? I have two alternates that are out there. Why -- why not bring -- if somebody got hit by a bus this morning I would bring in the alternate juror. I wouldn't -- I don't know what the difference is. Why should I declare a mistrial?
>
> . . . [W]e don't even know that the person that has written the [note] is the holdout, we don't even know there is a holdout. For all we know it's six/six. . . . Or eight/two or eight/four or whatever it is. We don't know anything except for the very first note what the -- what it was. And as we noted before, the gender's changed. The first note was one gender, the second note was another gender. So for all we -- we have -- this is just pure rank speculation at this point. So why isn't the --. . . so my my question is, the Court's thinking is, I've got a juror that's violated the instructions, she -- obviously she felt compelled to do it. She may -- who knows what she'll feel compelled to do with-- in the future if I keep her on the jury. Why don't I strike her for cause, bring in the alternate?

Defense counsel conceded, "I agree that the pronouns change . . . ." At the same time, he argued, one person seemed to have become the target of the last two notes. It was "fair to say" the atmosphere in the jury room had become one of "frustration" and "animosity[.]" Thus the defense maintained that a mistrial should be declared, because otherwise the replacement juror would feel coerced.

---

**3**This concern is firmly grounded in Michigan state law on juror removal. *See, e.g.*, *People v. Dry Land Marina, Inc.*, 437 N.W.2d 391, 394 (Mich. Ct. App. 1989) (flagging constitutional concerns implicit in juror removal and then observing that "the most substantial danger of a violation of the [state rules of procedure on point] is that the alternate joining a panel which has engaged in deliberations may be coerced and unduly influenced by those jury members who have already formed an opinion.") (citing *United States v. Phillips*, 664 F.2d 971, 992–93 (5th Cir. 1981)).

The judge consulted MCR 6.411, which empowered him to retain the alternate jurors during deliberation and use them, if necessary, to replace jurors, provided that the jury was instructed to begin deliberations anew. He then ruled:

> I reject the speculation that -- that there is sufficient cause at this point to warrant a mistrial. That is based on a speculation and conjecture about what's going on in the jury room. What we do know is that there have been some notes, and we've discussed those ad nauseam, that one juror has retained counsel and has -- that counsel has made a statement on the Record. I find that that is a flagrant violation of this Court's jury instructions, that that constitutes good cause to excuse that juror for cause, and I so by order that she be excused. How that affects the complexion of the jury deliberations is unknown and is not the province of any individual to pierce into.

Once the alternate was seated, the judge ordered the jury to "begin your deliberations anew." The reconstituted jury returned a guilty verdict within one and a half hours. Wofford received a mandatory sentence of life without parole.

## C. The Appeal

Wofford appealed to the Michigan Court of Appeals, where he raised two issues: a challenge to the removal of Juror M, which he framed as a "den[ial]" of "his Sixth Amendment right to have his jury decide his fate" and a sufficiency-of-the-evidence claim that is not before us.[4]  As to the first ground, Wofford's court-appointed counsel opened his briefing with a reference to a federal Sixth-Amendment case:

> The case of *United States v Thomas*, 116 F.3d 606, 621 (CA 2, 1997), provides helpful guidance: "To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." Also, "If the record raises any possibility that the juror's views on the merits of the case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed." *Id.* at 622, n. 11 (internal citations omitted).

---

[4]This was rejected. Wofford raised it again, and it was again rejected, in his habeas proceedings. He was denied a certificate of appealability on that ground.

Wofford then discussed a defendant's right to have his case heard by the original jury selected, referring to several Michigan precedents,[5] as well as two United States Supreme Court double-jeopardy cases.[6] Wofford, his counsel concluded, had been "deprived of his right to have his case fairly tried and determined by his jury."

The MCOA rejected this argument. It assessed Wofford's claims relating to the juror removal in light of *People v. Tate*, 624 N.W.2d 524, 529 (Mich. Ct. App. 2001), from which it quoted the following rule:

> [W]hile a defendant has a fundamental interest in retaining the composition of the jury as originally chosen, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate. Removal of a juror under Michigan law is therefore at the discretion of the trial court, weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate.

*People v. Wofford*, No. 318642, 2015 WL 1214463, at \*2 (Mich. Ct. App. Mar. 17, 2015) (brackets in original) (quoting *Tate*, 624 N.W.2d at 529 (cleaned up)). Analyzing Wofford's case under this rubric, the MCOA made several factual findings. First, that "[c]ontrary to defendant's assertion on appeal, the trial court did not remove [Juror M] because she was a lone hold-out who was standing in the way of conviction." 2015 WL 1214463 at \*2. As the MCOA saw it:

> Early on in the deliberations, the jury informed the court that they were 11 to 1. However, the jury did not reveal which way the majority was leaning or the identity of the hold-out. Several days of continued deliberation then ensued. As the trial court found, *there was no evidence at the time of [Juror M's] removal what way the jury was leaning*, or the potential division.

*Ibid*. (emphasis added). Second, the MCOA found that: "[T]he record clearly demonstrates that the trial court removed this juror because she flagrantly violated the court's instructions by discussing the deliberations with a non-juror." *Ibid*. Observing that "neither party contests"

---

[5]*People v. van Camp*, 97 N.W.2d 726, 732–33 (Mich. 1959); *People v. Tate*, 624 N.W.2d 524, 560 (Mich. Ct. App. 2001); *Dry Land Marina, Inc.*, 437 N.W.2d at 392; *People v. Gardner*, 195 N.W.2d 62, 65–66 (Mich. Ct. App. 1972); *People v. Henley*, 182 N.W.2d 19, 25–26 (Mich. Ct. App. 1970).

[6]*United States v. Jorn*, 400 U.S. 470, 479 (1971); *Wade v. Hunter*, 336 U.S. 684, 689 (1949).

Juror M's "blatant disregard for the court's instructions, nor that it implicated her ability to follow jury instructions[,]" the MCOA concluded that the trial judge had correctly "protected [Wofford's] right to a fair and impartial jury 'by removing a juror unable or unwilling to cooperate.'" *Ibid.* (quoting *Tate,* 624 N.W.2d at 529).

Finally, the MCOA observed that Wofford had argued that "the trial court still should have granted a mistrial because of the danger that the alternate juror would be influenced when faced with 11 jurors who were convinced of his guilt." *Id.* at *3. To this, it responded:

> Yet . . . there is no evidence regarding what way the jury was leaning at the time of [Juror M's] removal. Thus, to conclude that there was only one hold-out, or that it was [Juror M], is mere speculation. Significantly, the trial court properly instructed the newly configured jury that it must deliberate anew, and disregard its prior deliberations. See MCR 6.411; *Tate,* 244 Mich.App at 567 ("the jury in such situations should be instructed to begin deliberations anew."). . . . "Because it is . . . pure speculation that the alternate juror was coerced, we conclude that defendant was not prejudiced by the substitution of the alternate juror." *People v. Mahone,* 294 Mich.App 208, 218; 816 NW2d 436 (2011).

*Id.* at *3 (third ellipsis in original). The MCOA thus held that Wofford's rights had not been violated, and the Supreme Court of Michigan denied him leave to appeal. *People v. Wofford*, 869 N.W.2d 598 (Mich. 2015).

## D. The Habeas Petition

Wofford then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. The district court applied AEDPA deference when reviewing three factual findings: that there was "no evidence" of "what way the jury was leaning" when Juror M was removed; that the trial court did not remove Juror M *because of* her views; and that the judge removed Juror M for "flagrantly violating the court's instructions." The district court found the first to be rebutted by clear and convincing evidence: Once the confusion over the gender in the notes is removed, it is clear that "all along the way, there was but one holdout," namely Juror M. The court said that the post-removal guilty verdict confirmed this, especially as it was obtained within ninety minutes. Despite expressing "skeptic[ism,]" the court held that the other two factual findings could not be rebutted by clear and convincing evidence.

Then the district court turned to the legal analysis. It held that AEDPA's deferential standard of review did not apply to the MCOA's legal analysis because that court had "never addressed 'the merits' of Wofford's claim that his Sixth Amendment right to a unanimous jury was violated." It evaluated whether the MCOA had addressed the merits of Wofford's Sixth Amendment claims by comparison to *United States v. Brown*,[7] *United States v. Thomas*,[8] and *United States v. Symington*[9]—a trio of cases from the D.C., Second, and Ninth Circuits—that held, in various formulations, that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Symington*, 195 F.3d at 1087 (emphasis in original).[10] The district court held that Wofford had raised, and thus preserved, his Sixth Amendment claim—which it characterized as a "Sixth Amendment right to a unanimous verdict"—by citing *Thomas*, and further held that the Michigan courts had inadvertently overlooked this Sixth Amendment claim. The district court found it particularly significant that the MCOA never mentioned *Thomas*, nor cited "*Brown*, *Symington*, or a like case."

Freed from AEDPA deference, the district court proceeded to apply the test from *Symington*, finding that the record disclosed a reasonable possibility that the impetus for Juror M's dismissal stemmed from the merits of the case and that "Wofford was thus deprived of his Sixth Amendment right to a unanimous verdict." The writ of habeas corpus was granted, and the state was ordered to re-try Wofford or release him within 90 days.[11]

This appeal timely followed—which would normally be the end of the factual narrative. But something unusual happened two months later. In January 2019, the district court issued a further order addressing the state's motion for a stay pending appeal and Wofford's motion to be released on bond. It granted the former and denied the latter. In doing so, the court substantially

---

[7]823 F.2d 591 (D.C. Cir. 1987).

[8]116 F.3d 606 (2d Cir. 1997).

[9]195 F.3d 1080 (9th Cir. 1999).

[10]The *Symington* test is modified slightly from the original formulation in *Brown* and that in *Thomas*, but not in a way that is meaningful for us today. *See infra*, n.28.

[11]The district court, having granted Wofford's petition on these grounds, declined to review alternate arguments he had made.

revised the basis for its initial opinion. The state had argued in its brief on the motion that the district court's initial ruling was in error, as the Sixth Amendment right to a unanimous jury had not been incorporated into the Fourteenth Amendment so as to apply to the state. (This was true both at the time the district court ruled on the habeas petition and also when the motion for stay was briefed and decided.) The district court explained that even if the Warden was right, he was missing "the bigger point":

> The Court's holding rests on the test of *Symington*. . . . And that very same test is used to decide whether a criminal defendant's right "against improper interference with jury deliberations" has been violated. *See Williams v. Cavazos*, 646 F.3d 626, 646 & n.17 (9th Cir. 2011), *rev'd on other grounds sub nom. Johnson v. Williams*, 568 U.S. 289 (2013). And that right has been incorporated against the states[.]

For this proposition, the district court then quoted the following excerpt from *Williams v. Cavazos*:

> The Sixth Amendment protection required by *Brown* and foreshadowed by *Symington* is against improper interference with jury deliberations. Freedom to deliberate without coercion is a necessary component of "the interposition between the accused and his accuser of the common-sense judgment of a group of laymen," which is "the essential feature of a jury." *Williams*, 399 U.S. at 100, 90 S. Ct. 1893. This component of the Sixth Amendment is thus incorporated with respect to the states through the Due Process Clause of the Fourteenth Amendment. In *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999), for example, we held that improper coercion had broken a jury deadlock to produce the ten-to-two vote needed to convict under Oregon law, and granted habeas as a result. Similarly, the deadlock-breaking dismissal of a holdout juror on an improper basis is an unconstitutional form of interference with deliberations.

*Williams*, 646 F.3d at 647 n.17. Therefore, the court concluded that "*while the Warden might be correct that the Court misstated the Sixth Amendment right at issue*, the Warden's argument does not undermine this court's essential reasoning." (Emphasis added.)

This order, in attempting to fix one problem, created two others. The first is obvious: the district court, having come very near to acknowledging a fundamental flaw in the earlier ruling, attempted to recast it not through a rehearing or reconsideration, but rather through a separate order. The second is that, as we shall see, the Ninth Circuit opinion in *Williams* is

highly doubtful law. It was not "rev[erse]d on other grounds," but rather on the exact same grounds as in this case.

## II. Standard of Review

Appellate review of a district court's decision not to apply AEDPA to a petition for a writ of habeas corpus involves the application of multiple standards nested within one another like Russian dolls. We review the district court's decisions of law *de novo* and of fact for clear error. *Wheeler v. Simpson*, 852 F.3d 509, 514 (6th Cir. 2017); *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014). But federal courts in turn have a statutorily prescribed standard by which it is to assess the decisions of the state courts. Federal courts are not to grant a writ of habeas corpus to state prisoners "with respect to any claim that was adjudicated on the merits in State court proceedings" unless that state court ruling:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). State court adjudications are "contrary to…clearly established federal law, as determined by the Supreme Court of the United States," § 2554(d)(1), only "'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]' or 'if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result].'" *Wheeler*, 852 F.3d at 514 (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). As the Supreme Court has emphasized again and again, "circuit precedent does not constitute 'clearly established federal law *as determined by the Supreme Court of the United States*.'" *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (emphasis added) (citation omitted) (quoting 28 U.S.C. § 2254(d)(1)) (noting that "we have repeatedly pointed [this] out"); *see, e.g.*, *Lopez v. Smith*, 574 U.S. 1, 2 (2014). In other words, a petitioner for a writ of habeas corpus in a case subject to AEDPA *must* be able to point to a Supreme Court precedent on point, not just favorable circuit law, or his petition "cannot succeed." *Scott*, 760 F.3d at 506.

Furthermore, with respect to using section (d)(2) to assess factual determinations made by a state court, AEDPA prescribes that: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A district court's failure to apply these standards is error.

Thus, the hurdle for a district court to overturn the rulings of a state court is very high. To be sure, "[t]he standard is demanding but not insatiable," *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and "[d]eference does not by definition preclude relief." *Ibid.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). But AEDPA nevertheless "sets forth a heavy burden for a petitioner to overcome." *Tibbets v. Bradshaw*, 633 F.3d 436, 442 (6th Cir 2011). Lower federal courts are not supposed to sit as courts of general review on state courts within their district or circuit, and thus Congress has forbidden such review. *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quoting *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)) (cleaned up)).

Thus, to put it all together, we examine *de novo* whether the district court correctly ruled, on the law, as to whether the state court arrived at a conclusion on federal law opposite to that reached by the Supreme Court or unreasonably reached a different conclusion from the Supreme Court when confronted by a materially indistinguishable fact pattern. And we review for clear error the district court's finding of facts, but the defendant must have shown the district court, by clear and convincing evidence, that the state court's determination of facts was unreasonable.

All that being said, AEDPA's demanding system of deference does not apply to the district court in one circumstance: if the state court has, through "sheer inadvertence" overlooked a plaintiff's federal claim. *Johnson*, 568 U.S. at 302–03. This must be shown "very clearly" by the evidence, *id.* at 303, because usually we presume that a state court—whether it has addressed only some of the issues presented on appeal or even none at all—has adjudicated all claims brought on the merits. *See id.* at 298–303; *Richter*, 562 U.S. at 98–100. In the rare circumstance where the state court has inadvertently overlooked a claim, the district court can review that claim *de novo*, *i.e.*, freed from the constraints of AEDPA deference. *Johnson*, 568 U.S. at 303.

We would then apply the usual standards of appellate review—*de novo* on the law and clear error on the facts—to the district court's rulings. *Scott*, 760 F.3d at 504 (citation omitted).

### III. Factual Analysis Under AEDPA

We turn first to review the district court's determinations of fact under AEDPA; once we have established what the facts are, we will proceed to the law. The district court reviewed three factual determinations made by the Michigan courts for whether the defendant had shown them to be wrong by clear and convincing evidence. They were: (1) that, according to the MCOA, there was "'no evidence' of 'what way the jury was leaning' or 'the potential division' at the time Juror M was removed" (quoting *Wofford*, 2015 WL 1214463, at *2); (2) that "the trial court did not remove [Juror M] because she was a lone hold-out who was standing in the way of conviction" (quoting *Wofford*, 2015 WL 1214463, at *2); and (3) that "the trial court removed this juror because she flagrantly violated the court's instructions."[12] (Quoting *Wofford*, 2015 WL 1214463, at *2.) The district court found the first to be rebutted by "clear and convincing evidence," but it upheld the other two under the same standard. 28 U.S.C. § 2254(e)(1). The district court was correct to do so as to all three factual findings.

### A. The Record Shows There Was One Holdout All Along

The secrecy of deliberations is one of the most vital components of the jury system, and courts strive mightily to maintain it. But just because we are forbidden to look into the black box does not mean we should deliberately ignore signals coming out of it. The MCOA, whose decision—rather than that of the trial court—was reviewed by the district court in this case, repeatedly asserted that there was "no evidence" of "what way the jury was leaning" or the "potential division" when Juror M was removed. *Wofford*, 2015 WL 1214463 at *2–3.

As we have seen, there was persistent confusion in the courtroom over whether one juror or two had held out, as a result of the defense attorney's misremembering the first note as

---

[12]In fact, for this third claim, the full quote selected by the district court from the MCOA decision is "the record clearly demonstrates that the trial court removed this juror because she flagrantly violated the court's instructions." This seems actually to suggest two distinct factual issues: that the trial court removed the juror because she flagrantly violated the court's instructions, and that the record clearly demonstrates this. However, the district court analyzes only the former. That seems to be far more important, so we do the same.

containing a male pronoun. This goes to the subjective understanding of the judge at the time he made his removal decision, which matters for other reasons. *See infra*, p. 20. But the MCOA was speaking to what is now shown by *the evidence*, not what was then in the judge's mind. And the evidence shows a clear picture.

Fairly early in the deliberations—at most, 7 hours in—a deadlock set in. The jury was split 11–1 "with no chance of the one moving their [sic] view." The next day, two notes mentioned a hung jury. It seems very unlikely that the jurors would have continued to consider the situation a deadlock had the composition of the vote switched from Monday to Tuesday. Furthermore, as the federal district court observes, both of the notes reference a single juror, and one of them makes it clear that this was a female juror. Two days later, the situation had become so acrimonious that Juror M hired an attorney to speak with the judge—in the process, revealing her identity and thus her gender, female. It seems improbable that this amount of pressure built up if the holdout juror had not been the same person the whole time.

Were we to imagine otherwise, that would mean at least ten people had changed their minds at least once. Putting aside the matter of comparative statistical likelihood, surely this would have shown a room full of jurors who were reconsidering their previously-held positions and changing their views—which seems entirely inconsistent with the atmosphere articulated in the notes, that of each side digging in and frustration mounting. Finally, of course, there is the fact that once Juror M was removed, the jury returned a guilty verdict within an hour and a half.[13] Together, these facts demonstrate to us "clearly and convincingly" that, as the district court concluded, "all along the way, there was but one holdout: Juror M." Put another way, we cannot conclude that the district court was wrong to find that the defendant had rebutted the presumption in favor of the factual finding of the MCOA on this point.

---

[13]This is not to imply that an hour and a half was too short for proper, *ab initio* reconsideration, or that the time elapsed indicates coercion. *Compare United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) (en banc) (citing the 29-minute length of the second deliberation as evidence that coercion had occurred) *with People v. Cleveland*, 21 P.3d 1225, 1230 (Cal. 2001) (jury returned "less than two hours" after alternate was seated; no coercion found); *see also Dry Land*, 437 N.W.2d at 330–31 (length of second deliberation can indicate jury started fresh and there was no coercion). Indeed, as the jury considered itself helplessly deadlocked within seven hours the first time around, an hour and a half does not seem an unreasonable amount of time to deliberate in the absence of a holdout. Rather, the point is that had Juror M *not* been the holdout juror, resolving the six-day impasse would likely have taken far more than an hour and a half, if it were resolved at all.

As we have noted, judges are enjoined strongly to respect the secrecy of jury deliberations. What seems to have happened here was that both at the trial and appellate level, over-scrupulousness as to this commandment led perhaps to obliviousness as to what was going on. At trial level, this was compounded by, but also in large part excused by, the confusion over the gendered pronoun. On appeal, looking at the evidence without such confusion, the conclusion should have been plain. We therefore uphold the district court's finding the that the factual determination of the MCOA on this point was rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. The Trial Court's Reasons for Removing Juror M

The district court expressed skepticism of, but ultimately let stand, the MCOA's determinations that "the trial court did not remove [Juror M] because she was a lone hold-out who was standing in the way of conviction" and that "the record clearly demonstrates that the trial court removed this juror because she flagrantly violated the court's instructions." *Wofford*, 2015 WL 1214463, at *2. It examined both together, which makes sense, as each is the flip side of the other. To work through it logically, though, we should look at the latter determination first. If the trial court did not have at least a good independent reason to remove Juror M, the entire analysis would become different—all that would be left would be Juror M's holdout status, which would be an impermissible basis for removal. If the trial court *did* have a good, independent reason to remove Juror M, on the other hand, the inquiry then becomes whether this was pretextual or the actual reason for removal.

First, the trial court did have a good independent reason to remove Juror M. As we have seen, at the beginning of the trial, at the close of every day, and the end of the trial, the judge warned jurors not to talk to anyone about the trial. Juror M contacted an attorney about the deliberations in the case. The trial judge found "that *that*" was "a flagrant violation of this Court's jury instructions."[14] (Emphasis added.) Wofford tries to make hay out of the fact that the jury

---

[14]The record makes it clear that the judge was referring to the hiring of counsel specifically: "[O]ne juror has retained counsel and has -- that counsel has made a statement on the Record. I find that that is a flagrant violation of this Court's jury instructions, that that constitutes good cause to excuse that juror for cause, and I so by order that she be excused." This makes it clear that this violation of the judge's instructions—and not other violations that might appear from the record, such as the use of a dictionary to perform legal research as alleged in

instruction given on the Monday said only not to "talk directly with the Judge, lawyers, court officers or other people involved in the case." But even if we read "lawyers" as "lawyers . . . involved in the case," the omission of outside lawyers here is hardly surprising—as one of the defense counsel noted on the day the juror's attorney showed up, he had "[n]ever had this happen in 21 years." And the omission of a catch-all phrase such as "and no one else" makes sense given the context of that instruction, which arose after a juror handed a note to the judge's clerk. It also should have been read in the light of the judge's constant daily reminders not to talk to anyone else about the case. Thus, even if this instruction did not explicitly say "outside lawyers," it was entirely reasonable for the trial judge to conclude that the juror's actions violated the letter of his many former instructions not to talk to *anyone* about the case, as well as the spirit of his formal jury instruction. It is a basic starting point of Michigan law (as well as all other authorities cited in the legal discussion below) that it is for the trial judge, acting within sound discretion, to make decisions regarding juror dismissal. *See, e.g.*, *Tate*, 624 N.W.2d at 529; *Symington*, 195 F.3d at 1085 (noting also that "as a general matter, the district court [is] in the best position to evaluate the jury's ability to deliberate.") (cleaned up). We cannot say that this interpretation of his instructions, or the decision to dismiss, was outside of the bounds of the reasonable.

The district court pronounced itself "skeptical" of the MCOA's findings of fact on this front because:

> [I]t was obvious to all that from the time of the very first note, there was a single holdout. Consider too that the judge said, "I'm not sure one way or the other at this point whether or not [Juror M's] violation constitutes cause to excuse her," then, without any new insight from counsel on that particular issue, found that Juror M's conversation with an attorney "flagrant[ly]" violated his instructions. (R. 9, PageID.2128.) And if Juror M flagrantly violated the court's instructions by contacting an attorney, why were the notes from the jury indicating where they stood not also a "flagrant" violation of his instructions? Yet the foreperson was not removed.

Again, it is within the sound discretion of the trial judge to weigh questions such as which violations are severe enough that dismissal is required, as opposed to which can be handled by

---

one note, or the intent to nullify or refusal to deliberate indicated in others, was the basis of the judge's dismissal decision.

other, less drastic means. It should also be self-evident that a judge can change his mind by taking some time to think about things, as well as—or instead of—listening to counsel. As to the first objection—that it was obvious from the start that there was a single holdout—the district court itself answers this a paragraph later: "[T]he trial judge's statements that a mistrial would be based on 'speculation and conjecture about what's going on in the jury room' and that Juror M had flagrantly violated his instructions suggest that, *in the judge's mind*, Juror M was not the holdout and that, in his mind, the problem with Juror M was that she violated his instructions."

That brings us in turn to whether the court's finding of, or reliance on, the violation of the court's instructions was pretextual. The record reveals nothing to indicate that the judge bore an animus against Juror M, or that he was trying to influence the verdict, or that he was in any way behaving other than as a judge trying to apply the law and, as it requires, not rush a mistrial after a long and important criminal case. The mistake about the gender of the juror, while unfortunate, made it *subjectively* less likely (as the district court noted) that the judge was targeting Juror M in particular for her views. To be sure, we are—as was the district court— working from a cold record. But there is nothing here, beyond the bare facts—that there was a holdout, the notes from the jury, the appearance of counsel, and the judge's decision to remove that juror—to suggest that his removal decision was actuated by the juror's views on the case.

Moreover, in order to disturb the MCOA's findings on this front, we would have to find both that the district court was clearly in error in upholding them and that the defendant can rebut the MCOA by clear and convincing evidence. There is certainly not enough evidence to do so. Thus, the findings stand: we hold that the judge did not remove Juror M because of her holdout status, and that he did remove her for violation of the court's instructions. As we shall see, that is of considerable significance when considering whether an actual constitutional violation occurred. For now, however, we turn to the analysis of the sources of law that we will use to evaluate these facts, and then to the application of AEDPA.

## IV. Legal Analysis

We begin by establishing the existence and limits of the constitutional right that underlies Wofford's claim, before turning to the doctrines that Michigan and federal courts have crafted to

protect that right. Then we examine how AEDPA affects our review of how the MCOA and the district court applied these doctrines.

### A.  Juror Removal and the Role of the Trial Judge

Since oral argument in this case, the Supreme Court has issued a decision that brings much-needed clarity to where the right in question before us is found in the Constitution. In *Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390 (2020), the Court confronted the question of whether the Sixth Amendment requires a unanimous jury verdict to convict in criminal cases and whether this right was incorporated into the Fourteenth Amendment so as to apply to the states. *Id.* at 1394, 1399. The Court found that it did and that it was incorporated. *Id.* at 1397, 1408. Such a right was located, the Court held, in the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." *Id.* at 1395 (quoting U.S. CONST. amend. VI.). "The text and structure of the Constitution clearly suggests that the term 'trial by an impartial jury' carried with it *some* meaning about the content and requirements of a jury trial." *Ibid*. The Court surveyed a wide array of sources, from the early roots of the common law in medieval England to the time of the Founding and to the modern age, and found that "[o]ne of these" substantive "requirements was unanimity." *Ibid.*; *see id.* at 1395–97 & nn.9–24.

Though the two are conceptually related, the constitutional right at issue in this case is not precisely the same as a unanimous-jury right. Wofford illustrates this well by arguing that if the state required a 10–2 vote (albeit this is now forbidden) and the jury were split 9–3, a judge could still not impermissibly remove and replace one of the three dissenting jurors so as to secure a guilty verdict. Thus, *Ramos* does not exactly resolve the issue before us. But it does provide significant guidance. The constitutional question at the heart of our case is whether and under what circumstances a judge can remove a juror either for the juror's substantive views or for misconduct or in a situation where there is both possible substantive disagreement and misconduct. Insofar as there are constitutional protections against certain impermissible juror-removal decisions (and, as we shall see, there are), they are part of the "requirements" that the *Ramos* Court recognized as inherent in the right to "trial by an impartial jury" secured by the Sixth Amendment.

An examination of sources similar to those relied on by *Ramos*—in some instances, the same sources—illustrates the content and limits of this right. This not only allows us to identify the right asserted in this case with greater precision than was possible in the precedents that predate *Ramos*, but also shows the historical and logical reasons that Fifth-Amendment and Rules-of-Criminal-Procedure issues so often appear entangled with Sixth-Amendment issues in juror-removal cases. Once this is clearly seen, a misperception that afflicted the court below— that a case discussing these sources of law is not focusing on the Sixth Amendment right— becomes easier to understand and dispel. That will be explored in the subsequent sections. First, however, we turn to the core constitutional right in question today.

The jury trial had a long, convoluted development during the early Middle Ages, but it does not appear at any time that judges would routinely remove jurors due to their decisions.[15] In 1367, it was established that they *could* not do so. At an assize in that year, a jury split 11–1, and the judges trying the case "took a verdict from these and imprisoned the twelfth." Thayer, 88. As Thayer explains:

> On moving for judgment, when counsel urged that it had formerly been adjudged in trespass that a verdict of eleven might be good, "and this we will show you by record," — Thorpe, C.J., said: "It is fundamental (*la ley fuit fondue*) that every inquest shall be by twelve . . . and no fewer. . . . Though you bring us a dozen records, it shall not help you at all; those who gave judgment on such a verdict were greatly blamed." Moubrey, J.: "As the verdict was by eleven and judgment cannot be rendered, sue out a new inquest and let the man imprisoned be discharged."

*Ibid.* (ellipses in original) (citing *Anonymous Case*, 41 Lib. Assisarum 11 (1367), and 2 MATTHEW HALE, PLEAS OF THE CROWN 297 (1736)); *see also* Forsyth, 241. The *Ramos* Court cites this case from 1367 for the development of the principle of unanimity. *See* 140 S. Ct. at 1395 & n.11. But for our purposes, what matters is that the 1367 case held that a judge could not

---

[15]See generally WILLIAM FORSYTH, HISTORY OF TRIAL BY JURY 199–208 (1852); 2 SIR FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 627– 705 (2d ed. 1898); JAMES BRADLEY THAYER, PRELIMINARY TREATISE ON EVIDENCE AT THE COMMON LAW 47–136 (1898). In its early years, when the jury was split, judges would often add jurors until one side or the other obtained twelve votes. Thayer, 63; Forsyth, 238. Forsyth therefore speculates that the need for twelve unanimous jurors "was simply . . . the amount of evidence which the law deemed to be conclusive of a matter in dispute." Forsyth, 239. After a while, the need for unanimity and twelve jurors remained, but judges could no longer add to the body; they do not seem often to have subtracted.

remove a juror due to a disagreement on the merits of the case. As a modern history confirms, verdicts were taken from eleven jurors before 1367, with six instances of jurors being imprisoned for being the holdout juror before that year, but thereafter the practice was regarded as illegal. David J. Seipp, *Jurors, Evidences and the Tempest of 1499*, *in* THE DEAREST BIRTH RIGHT OF THE PEOPLE OF ENGLAND: THE JURY IN THE HISTORY OF THE COMMON LAW 88 (John W. Cairns & Grant McLeod eds., 2002). *See also* Thayer, 88–89 n.4.

For several centuries, judges retained other ways of punishing those jurors who were thought to have given verdicts contrary to the evidence and/or the law. Primary among these was the fining or imprisonment of jurors for their verdict, until this practice was abolished in *Bushel's Case*, 124 Eng. Rep. 1006 (C.P. 1670). That is, while after 1367 the juror could not be removed from the jury, until 1670 he could still be imprisoned or fined after the fact. Courts also had tools that were not punishments as such but would nowadays be regarded as coercive. It was accepted practice that judges would cut off the jurors from food and drink until they returned a unanimous verdict. Thayer, 155 & n.2; 2 Hale, 297. Judges could also cart the jury around from town to town as the judges rode circuit, until the jury came to a decision. 2 Hale, 297; Forsyth, 241. Such methods usually produced unanimity of result, if not of conscience.[16] American courts abandoned these coercive practices by or around the time of the Founding.[17]

Judges instead came to rely, starting in the seventeenth century, on their authority to declare a mistrial as a way of dealing with jury misconduct. *See Hinton v. United States*, 979 A.2d 663, 672 & nn.17 & 20 (D.C. 2009); Thayer, 169. But while this method, unlike a fine or a trip to jail, did not harm the jurors, it fell hard on someone else: the defendant. This was a particular concern in criminal trials, where there was a well-founded concern that certain judges would "'withdraw[] a juror' and declar[e] a mistrial in order to thwart an acquittal." *Hinton*,

---

[16]British judges may have had powers that went beyond these. A study of the records of criminal trials at the Old Bailey c.1675–1735 revealed that judges during this period would in at least some cases reject the jury's verdict and direct it to reconsider. John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. CHI. L. REV. 263, 291–95 (1978) (calling such instances "the outer extreme" and "extremely rare"). Such authority appears not to have been accepted in colonial America, however. *See* Douglas G. Smith, *The Historical and Constitutional Contexts of Jury Reform*, 25 HOFSTRA L. REV. 377, 439–41 (1996).

[17]*See Commonwealth v. Bowden*, 9 Mass. 494, 495 (1813); Janet E. Findlater, *Retrial After a Hung Jury: The Double Jeopardy Problem*, 129 U. PA. L. REV. 701, 737 n.25 (1981) (collecting cases).

979 A.2d at 673. "In reaction to such abuses, common law judges eventually settled on a generally applicable rule of practice: no juror could be withdrawn, and no jury could be discharged, unless it was necessary to do so." *Ibid.* (collecting sources from 1698 onward).

In England, assessing the "necessity" involved was left to the trial court's discretion—which still left potential for abuse. In America, things were different:

> In early American jurisprudence, more plainly than in coeval British decisions, the rule against unnecessary mistrials was a right the defendant could assert. In part, that was because "state courts . . . blend[ed] the rule against needless discharges of juries into the guarantee against double jeopardy contained in the Federal and State Constitutions," despite the contrary analysis of roughly contemporary English jurists, who traced the rule to the maxim that once constituted, a jury could not be discharged until it had returned a verdict.

*Id.* at 674 (footnotes and citations omitted). That said, the judge's authority to remove a juror for *good* reason was long established: Already, in Hale, we read that "[t]he justices at common law may upon a just cause remove a juror after he is sworn." 2 Hale, 296. Among circumstances that constituted good cause were not only death, illness, family emergency, or the discovery that a juror was also a witness or grand juror,[18] but also certain types of juror misconduct.[19]

Thus, by the time of the Founding, it had been long-settled that a judge could not remove a juror due to his substantive opinions on a case or punish the juror in any other way for that

---

[18]*See Commonwealth v. Fells*, 36 Va. 613, 617–19 (1838).

[19]Misconduct is a term with many meanings in this context. One common type of misconduct seems to have been leaving the jury without permission. *Commonwealth v. Cook*, 6 Serg. & Rawle 577, 585, 1822 WL 1855, at *5 (Pa. 1822) ("Sir M. Hale mentions a case (2 Hale 295) where, after the jury were sworn, and departed from the bar, one of them went out of town; the other eleven were discharged, and the one who went out of town was fined for his misbehavior, and the prisoner tried by another jury."). The same source speaks of a juror discharged for getting drunk and being unable to perform his duty. *Id.* at 585–86. And the concurrence in that case extrapolates more widely: Mistrial has been allowed "where it is on account of the misbehavior of a juror[.]" *Id.* at 591 (Duncan, J., concurring). *See also People v. Olcott*, 2 Johns. Cas. 301, 306, 1801 WL 657 (N.Y. Sup. Ct. 1801) (Kent, J.) (listing disappearance and drunkenness as grounds for discharge).

In light of the facts of the instant case, the concern of the courts in this era to prevent jurors from consulting outside information or violating court rules is also worth noting. *See* 2 Hale, 306–09. *See also Olcott*, 2 Johns. Cas. at 310 ("[A] verdict, obtained unfairly, by secret and artful, or bold and direct influence over the jury, by the parties, their friends, *or bystanders*, would, if admitted to be recorded, be a disgrace to the administration of justice. The power of discharging a jury, in these and other instances which might be enumerated, is a very salutary power, and calculated to preserve that mode of trial in its purity and vigour.") (emphasis added).

opinion.[20]  At the same time, the ability of the judge to remove jurors for certain causes had become well-settled, and among these causes was juror misconduct.  An understanding of both principles had come to inhere in the concept of "trial by jury."  They were, in short, among the substantive "requirements" "carried with" the public meaning of "the term 'trial by an impartial jury'" in the Sixth Amendment at the time its ratification.  *Ramos*, 140 S. Ct. at 1395.  Together, they set and delimit the scope of the substantive right at issue today.

One further source of law on juror removal needs to be mentioned.  Redoing a trial after a juror had been removed had always been recognized as onerous and, as trials became more complex, it became a bigger burden.  *See Hinton*, 979 A.2d at 675.  (This was true notwithstanding the practice of retaining the eleven remaining jurors and selecting a new one from the general public.  *Ibid.*)  Thus, starting in the late nineteenth century, states—and, in 1932, the federal government—passed laws providing for alternate jurors.  *See id.* at 675–76 & n.40.  This in turn gave rise to court rules governing when and how the court could remove an original juror and substitute an alternate, particularly Federal Rule of Criminal Procedure 24(c) (which governs substitution before the jury begins to deliberate) and Federal Rule of Criminal Procedure 23(b) (which governs removal after deliberation has begun).  These have been held constitutional.  *See, e.g.*, *United States v. Phillips*, 664 F.2d 971, 992–93 (5th Cir. 1981) (Rule 24(c)); *United States v. Acker*, 52 F.3d 509, 515 (4th Cir. 1995) (Rule 23(b)).[21]

Due to the nature of case-by-case jurisprudence, not all of the strands of doctrine implicated by the removal of a juror were developed at once.  Thus, the question of how the declaration of a mistrial did or did not implicate the right against double jeopardy was developed

---

[20]This is confirmed not only by the long pre-Founding history, but also by the same influential nineteenth century treatises to which the Supreme Court referred in *Ramos*. *Cf.* 140 S. Ct. at 1396 n.18 and accompanying text. Thus we read in Cooley that "The jury . . . . must be left *free to act*.  The final decision upon the facts is to rest with them, and any interference by the court to coerce them into a verdict against their will is irregular and unconstitutional." THOMAS COOLEY, CONSTITUTIONAL LIMITATIONS 320 (1868); *see also id.* at 320 n.1; 321 & n.1. It is hard to imagine a more "irregular" "interference by the court to coerce . . . a verdict" than the removal of holdout juror due to her opinion.

[21]Noting that Federal Rule of Criminal Procedure 23(b) is "a restatement of prior existing practice, the constitutionality of which was approved in *Patton v. United States*, 281 U.S. 276, 50 S. Ct. 253, 74 L.Ed. 854 (1930)." (citing the Advisory Committee note to that rule).

quite early, with a landmark Supreme Court case in 1824.**²²**  *Ramos*, on the other hand, was decided only this year.  This is not to say that the substantive rights conveyed by the Sixth Amendment's jury-trial guarantee were not recognized until this year; to the contrary, they were widely accepted.  But they often floated free of a doctrinal framework.  Thus, for example, the Second Circuit, in an influential opinion, would write simply:  "That a juror may not be removed because he or she disagrees with the other jurors as to the merits of a case requires no citation." *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988) (providing no citation).  *See, e.g., Thomas*, 116 F.3d at 622 n.11 (citing the same).  Not all analysis of the problems created by juror removal was so breezy:  Usually, courts interpreted rules (particularly Federal Rules of Criminal Procedure 23(b) and 24(c) or their state equivalents) or crafted judge-made doctrines in light of the background constitutional concerns implicated by the Fifth and Sixth Amendments, the principles of which were understood better than their source was articulated.  We review several of these cases as pertinent below, starting with the Michigan state-court precedents that the MCOA relied on in deciding Wofford's case.

## B.  Michigan Law on Juror Removal

As a result of the history we have just surveyed, it has not been clear where to ground the analysis of a trial court's decision to remove and replace a juror.  There are several ways to look at the problem.  It can be thought of as a legal question about double jeopardy: Are you trying the same person before two different juries?  Or an appeals court can ask when or whether the judge should have declared a mistrial, which implicates double-jeopardy jurisprudence but also the inherent power of appellate courts to oversee the discretionary judgments of trial courts.  But removal and replacement can also be regarded as matter of administering the federal or state rules of criminal procedure.  Or it can be treated as a question of Sixth Amendment jury rights, variously cast as a fair-and-impartial-jury, unanimous-jury, or trial-by-jury right.

---

**²²***United States v. Perez*, 9 Wheat. 579, 579–80 (1824).  In 1978, the Supreme Court characterized *Perez* as the start of a line of cases through which "it became firmly established by the end of the 19th century that a defendant could be put in jeopardy even in a prosecution that did not culminate in a conviction or an acquittal, and this concept has been long established as an integral part of double jeopardy jurisprudence." *Crist v. Bretz*, 437 U.S. 28, 33–34 (1978).

Cases addressing the issue, unsurprisingly, elide into one another and often are imprecise as to which right they are invoking.

In assessing Wofford's complaint, the Michigan Court of Appeals relied on *People v. Tate*, a Michigan appellate case. 624 N.W.2d 524. In *Tate*, the defendant argued that a juror's removal had to be shown to be for "just cause." The MCOA ruled that this was not so; rather that the basis for such a removal rested in the discretion of the trial judge, "weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate." *Id.* at 529. In reaching this conclusion, the Michigan court drew heavily on *People v. Dry Land Marina, Inc.*, 437 N.W.2d 391, 394 (Mich. Ct. App. 1989). *See Tate*, 624 N.W.2d at 529. These cases share in the overall trend of being clear on the rules for jury removal but mixing the doctrines from which they are derived.

*Dry Land* begins by analyzing strictly the removal of the juror, before reaching the replacement of the juror. It does so with reference to double-jeopardy precedents. *See* 437 N.W.2d at 392 (citing *Jorn*, 400 U.S. 470, and *Gardner*, 194 N.W.2d 62). Mindful of the federal precedents on mistrial going back to *Perez*, the court held that Michigan courts must use "less drastic alternatives" to declaring a mistrial if possible. *Id.* at 393. One of these less drastic alternatives is the empanelment of an alternate juror, a practice the *Dry Land* court approved. *Ibid.* But at the time, the Michigan rule under which the trial judge had empaneled the alternate authorized such replacement only in instances where the jury had not yet begun deliberating, as did the parallel federal rule. *Id.* at 393–94. As the judge had ordered the replacement *after* deliberations had begun, he had clearly exceeded the bounds of that rule. *Id.* at 394. The question therefore became whether the judge's decision violated the defendant's constitutional rights. *Ibid.* And this was a *Sixth* Amendment question.

In assessing this question, the *Dry Land* court relied on a series of federal cases in which federal courts confronted similar questions about whether admitted contraventions of Federal Rule of Criminal Procedure 24 also constituted Sixth Amendment violations.[23] *See* 437 N.W.2d

---

[23]At the time, Federal Rule of Criminal Procedure 24(c), just as the Michigan state rule in question in *Dry Land*, did not allow for substitution of an alternate after the jury had begun to deliberate. This has since been changed.

at 394. This required them, just as the *Dry Land* court was required, to determine the minimum requirements of that amendment. *See United States v. Hillard,* 701 F.2d 1052, 1056–57, 61 (2d Cir. 1983); *United States v. Kaminski*, 692 F.2d 505, 518 (8th Cir. 1982); *United States v. Kopituk,* 690 F.2d 1289, 1308–09 (11th Cir. 1982); *Phillips*, 664 F.2d at 991–93 & n.14; *Henderson v. Lane,* 613 F.2d 175, 177–79 (7th Cir. 1980).[24] Indeed, several provide clear examples of a court's acknowledging the multiple sources of rights involved in juror-removal questions. As *Kopituk* summarized, the "challenges . . . raised" in these cases were "that substitution of an alternate juror after the jury has commenced its deliberations violates the clear provisions of Fed.R.Crim.P. 24(c), *the right to trial by a fair and impartial jury guaranteed by the Sixth Amendment*, and the prohibition against being placed in double jeopardy incorporated within the Fifth Amendment." 690 F.2d at 1308–09 (emphasis added) (discussing *Phillips*, 664 F.2d at 971).

*Dry Land* and several of the federal cases just discussed do consider the danger that the power to remove a juror can be abused. They do so by distinguishing the Ninth Circuit case of *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975) (en banc).[25] The facts of *Lamb* seemed to show not merely a misapplication of Rule 24(c), but also judicial manipulation of the jury's voting process: the jury found the defendant guilty, but the judge refused to accept this verdict, as being in some unspecified way "inconsistent with his instructions." *Id.* at 1154–55. He then removed and replaced a juror, after which the jury returned a new verdict in twenty-nine minutes. *Id.* at 1155. The *Lamb* court therefore prescribed a prophylactic rule requiring retrial whenever an alternate was seated once deliberation had begun. This prophylactic rule was grounded, in part, on the fear that otherwise, "[a] lone juror who could not in good conscience vote for conviction could be under great pressure to feign illness or other incapacity so as to place the burden of decision on an alternate juror." *Id.* at 1156. But *Phillips*, *Hillard*, *Kopituk*, and the other cases cited above rejected this prophylactic rule, deciding instead to adopt a rule requiring a showing of actual prejudice.

---

[24]All but one of these cases explicitly discusses the Sixth Amendment. *United States v. Kaminski* speaks generally of constitutional rights, though it also cites *Phillips* for its rule. *See* 692 F.2d at 518.

[25]*See Dry Land*, 437 N.W.2d at 394; *Hillard,* 701 F.2d at 1059; *Kopituk,* 690 F.2d at 1310 & n.16; *Phillips*, 664 F.2d at 995; *Henderson*, 613 F.2d at 178.

*Dry Land*, citing those cases, adopted the same rule.**26** 437 N.W.2d at 394. The MCOA concluded that:

> The language of F.R.Crim.P. 24(c) [and MCR 6.102(A) ] is not constitutionally mandated. Therefore, there is no violation of a defendant's right to trial by a fair and impartial jury when an alternate juror is recalled and substituted for a deliberating juror excused by the trial court. *United States v. Phillips*, 664 F.2d 971, 992–993 (C.A. 5, 1981) cert. den. sub. [sic] nom. *United States v. Meinster*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L.Ed.2d 1354 (1982).

*Dry Land*, 437 N.W.2d at 394 (brackets in original). Thus, after *Dry Land*, the Michigan jury doctrine combined both Fifth and Sixth Amendment considerations, vested removal authority in the trial judge's discretion, and required a showing of an actual constitutional violation in the event a convicted defendant challenged the replacement of a juror. The *Tate* court relied heavily on this doctrine, which it boiled down into the aforementioned rule that the trial judge was to "weigh[] a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate." 624 N.W.2d at 529. In turn, the *Wofford* court quoted and relied on *Tate*'s rule.

## C. Federal Law on Juror Removal (and a Word on Jury Nullification)

As the district court in this case noted, several federal courts have imposed a prophylactic rule to deal with removal situations like that before us. In 1987, the District of Columbia Circuit addressed an appeal from a federal criminal trial in which a juror had been removed. *Brown*, 823 F.2d at 592. The juror had told the judge, first via note and then in court, that he was unable to perform his duties because "I can't go along with the [RICO] act." *Id.* at 594. But upon further questioning, he also stated that "[i]t's the way [the law is] written and the way the evidence has been presented." *Ibid.* The juror was removed, and the judge directed the remaining eleven jurors to deliberate as a jury of eleven under Federal Rule of Criminal

---

**26**Perhaps ironically, the extreme nature of the trial judge's conduct in *Lamb* seems to have persuaded these other courts that a prophylactic rule was not necessary. *See*, *e.g.*, *Henderson*, 613 F.2d at 178 ("In *Lamb*, the forced unanimity resulting from the substitution was apparent."); *Dry Land*, 437 F.2d at 394 ("[T]he facts in the *Lamb* case involve a particularly egregious violation of the rule.").

Procedure 23(b). *Id.* at 595.[27] The jury convicted, and Brown appealed. As this was a federal criminal case, the Sixth Amendment was recognized as conferring a right to a unanimous jury, though that was not yet incorporated against the states. *Ibid.* (citing *Apodaca v. Oregon*, 406 U.S. 404 (1972)). The court of appeals thus analyzed the removal as a potential violation of that right. 823 F.2d at 595. It found it "scarcely debatable" that "a court may not dismiss a juror during deliberations if the discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *Id.* at 596. "If a court could discharge a juror on the basis of such a request, then the right to a unanimous verdict would be illusory" because that "would enable the government to obtain a conviction even though a member of the jury . . . thought that the government had failed to prove its case." *Ibid.* On the other hand, it acknowledged that Federal Rule of Criminal Procedure 23(b) empowered a trial judge to remove a juror after the jury had begun deliberating "if . . . necessary" and "for just cause." *Id.* at 597. Courts, acting consistent with the Constitution, could use this rule to discharge jurors for misconduct. *See ibid.* (citing *United States v. Gambino*, 788 F.2d 938, 946–49 (3d Cir. 1986), for the removal of a juror "who had viewed relevant materials not in evidence[.]").

The court noted, however, that "the reasons underlying a request . . . will often be unclear." *Id.* at 596. Such situations therefore pose a problem. Moreover, the panel reasoned, it would damage the secrecy of jury deliberations for the judge to make searching inquiries of the juror(s) in such a situation. *Ibid.* Therefore, it crafted a prophylactic rule: "If the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Ibid.* "Any other holding," the court held, "would fail to protect adequately a defendant's right to be convicted only by a unanimous jury." *Ibid.*

Approximately a decade later, the Second Circuit and the Ninth Circuit confronted similar situations to that in *Brown*. *Thomas*, 116 F.3d at 606; *Symington*, 195 F.3d at 1082. In each of these cases, a juror, who turned out to be the holdout juror, was removed during a federal criminal trial. *Thomas*, 116 F.3d at 612; *Symington*, 195 F.3d at 1084. Again, there was

---

[27]Juries of less than twelve were upheld in *William v. Florida*, 399 U.S. 78 (1970). *Williams* may no longer be completely sound after *Ramos*. *See Ramos*, 140 S. Ct. at 1436 (Alito, J., dissenting).

evidence that pointed toward legitimate reasons for dismissal (in *Thomas,* both an inability to deliberate and a desire to nullify; in *Symington*, problems deliberating that may have been age-related), but there was also evidence that the juror had doubts about the prosecution's case. *Thomas*, 116 F.3d at 609–12; *Symington*, 195 F.3d at 1083–84. The district court in *Thomas* had dismissed the juror under Federal Rule of Criminal Procedure 23(b), and the remaining jury of eleven had convicted. *Thomas*, 116 F.3d at 612. In Symington's trial, an alternate was seated, with the same result. *Symington*, 195 F.3d at 1084. Both appellate courts framed their rulings as interpretations of the Sixth Amendment and Federal Rule of Criminal Procedure 23(b). *See Thomas*, 116 F.3d at 622; *Symington*, 195 F.3d at 1085, 1087. In each case, the circuit court adopted a version of *Brown*'s prophylactic rule.**28** *Thomas*, 116 F.3d at 621–22; *Symington*, 195 F.3d at 1087.

The Third and Eleventh Circuits have adopted a variation of the *Brown-Thomas-Symington* rule. *United States v. Kemp*, 500 F.3d 257, 304 (3rd Cir. 2007); *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001). So too have as have at least three states. *State v. Elmore*, 123 P.3d 72, 77–78 (Wash. 2005); *People v. Gallano*, 821 N.E.2d 1214, 1223–24 (Ill. App. Ct. 2004); *Garcia v. People*, 997 P.2d 1, 7 (Colo. 2000).

Moreover, as the *Brown-Thomas-Symington* rule became settled, courts have refined it. Most notably, the D.C. Circuit has recently clarified that even under *Brown*, "if the court forms an independent, good-cause justification for removing the juror that bears no 'causal link' to the juror's 'holdout status,' the court may excuse the juror even if the juror 'independently had

---

**28**The *Brown* court formulated its test as: "If the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request[.]" 823 F.3d at 596. The *Thomas* court enunciated its version as: "If the record raises any possibility that the juror's views on the *merits of the* case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed." 116 F.3d at 622 n.11 (emphasis in original). The *Symington* court said, "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." 195 F.3d at 1087. Moreover, the *Symington* court was concerned that these formulae differed, and specifically that were the word 'reasonable' not inserted, any shred of possible doubt would do. *See id.* at 1087 n.5. For our purposes (and in our review of the case law), however, they all impose a prophylactic rule against juror dismissal if there is evidence suggesting that the juror's dismissal is due to her views of the merits of the case. *See also United States v. Kemp*, 500 F.3d 257, 304 (3rd Cir. 2007) ("While there is a slight difference in the standards as expressed by the D.C. and Second Circuits as compared to the Ninth and Eleventh Circuits, we believe that the difference is one of clarification and not disagreement.").

doubts about the sufficiency of the evidence.'" *United States v. McGill*, 815 F.3d 846, 869 (D.C. Cir. 2016) (citing *United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006)). *See also United States v. Edwards*, 303 F.3d 606, 633 (5th Cir. 2002).

As this review of the federal cases has shown, there is a lurking specter in the background of this issue: jury nullification. The question has periodically arisen whether the jury had the power to construe the law as well as the facts. In nineteenth-century America, this view was embraced particularly by Jacksonian populists, and, notwithstanding its repudiation by the Supreme Court in *Sparf and Hansen v. United States*, 156 U.S. 51, 102 (1895), it has continued intermittently to be a subject of controversy up to our own time. *See Thomas*, 116 F.3d at 614–16 (collecting sources).

Nullification is particularly controversial in this country because it has played a role in America at its worst and its best. On the one hand, nullification has been associated with some of America's most important moments of civil disobedience. "The case of John Peter Zenger, the publisher of the *New York Weekly Journal* acquitted of criminal libel in 1735, and the nineteenth-century acquittals in prosecutions under the fugitive slave laws, are perhaps our country's most renowned examples of 'benevolent' nullification." *Thomas*, 116 F.3d at 614; *see also United States v. Dougherty*, 473 F.2d 1113, 1130 (D.C. Cir.1972). Moreover, in less-famous trials, the practice of nullification is thought to "introduce[] a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions." *Thomas*, 116 F.3d at 615, *quoting U.S. ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir. 1942) (Hand, J.), *rev'd on other grounds*, 317 U.S. 269 (1942).

On the other hand, juror nullification also played a role in ugly events. During the Jim Crow and Civil Rights eras, nullification was "used to sanction murder and lynching." *Thomas*, 116 F.3d at 616 (collecting sources). Moving from the ugly to merely the bad, we find cases in which nullification is used to protect "the defendant's shooting of his wife's paramour, or purchase during Prohibition of alcoholic beverages." *Dougherty*, 473 F.2d at 1130.

The settled conclusion of American courts has been that nullification is a power but not a right. *See, e.g.*, *Thomas*, 116 F.3d at 615. That is to say, jurors *can* vote to acquit in defiance of

the law, and courts in general cannot stop them—but courts will not encourage this, provide jury instructions acknowledging it, or allow lawyers to argue overtly for it. *See, e.g.*, *United States v. Krzyske,* 836 F.2d 1013, 1021 (6th Cir. 1988); *Thomas*, 116 F.3d at 617. *But see Krzyske*, 836 F.2d at 1021–22 (Merritt, J., dissenting); *cf. United States v. Gabrion*, 648 F.3d 307, 324 (6th Cir. 2011) (Merritt, J.), *reh'g en banc granted, opinion vacated* (Nov. 17, 2011) *on reh'g en banc*, 719 F.3d 511 (6th Cir. 2013). Therefore, when courts have crafted doctrines to protect against jurors' being removed for their views on the case, they are *not* doing so to protect jury nullification. Rather, they are acting to protect the right of the accused to "trial by an impartial jury," from which jury the judge cannot remove jurors for their views on the case, as well as to protect related concerns such as jury secrecy. Jury nullification is a byproduct of those rights, but it is not coterminous with them. As a result, even courts that craft expansive prophylactic rules to protect against improper juror removal have acknowledged that overt nullification can be a *proper* reason for removal. As the *Thomas* court put it:

> We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent. Accordingly, we conclude that a juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict.

*Thomas*, 116 F.3d at 614.

## D. The *Williams* and *Johnson* Precedents

State-court decisions requiring an actual constitutional violation to overturn a conviction because of juror removal, federal decisions imposing a prophylactic rule, and AEDPA all came together in the case of Tara Williams, which eventually reached the Supreme Court in *Johnson v. Williams*, 568 U.S. 289 (2013). Because of the significant number of parallels between that case and ours, we discuss it in some detail. Williams was the getaway driver in a liquor-store robbery in which her coconspirators shot and killed a teller. She was tried in a California state court for murder. In response to two jury notes (delivered simultaneously) indicating that one juror "has expressed an intention to disregard the law . . . and . . . has expressed concern relative to the severity of the charge," the judge interviewed each juror individually on the record. *Williams v.*

*Cavazos*, 646 F.3d 626, 631–32 (9th Cir. 2011), *rev'd sub nom. Johnson v. Williams*, 568 U.S. 289 (2013). In the face of more equivocal evidence than that which is before us today (including a split among the other jurors as to whether the juror in question was following the law and deliberating properly), the judge concluded that the juror should be dismissed as biased, citing evidence that suggested the juror disagreed with the law and had been dishonest. *Id.* at 634. An alternate was seated and Williams was convicted. *Id.* at 634–35.

Williams appealed on both state statutory and Sixth Amendment grounds. The California Court of Appeal upheld Williams's conviction on direct review, citing *People v. Cleveland*, 21 P.3d 1225 (Cal. Ct. App. 2001). *People v. Taylor*, No. B137365, 2002 WL 66140, at *8 (Cal. Ct. App. Jan. 18, 2002).[29] *Cleveland* is California's precedent on the removal and replacement of a juror where there is some doubt whether the removal was due to misconduct or the juror's views on the case. In an opinion that canvassed at great length both state precedents and the *Brown-Thomas-Symington* trio (but did not explicitly mention the Sixth Amendment), the California court in *Cleveland* had opted against the rule from *Brown*. California instead adopted a rule instructing the judge to "conduct 'whatever inquiry is reasonably necessary'" in such situations and "to discharge the juror if it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate." 21 P.3d at 1237. Put another way, *Cleveland* did not apply the prophylactic rule that if the record reveals a *possibility* that a juror's dismissal stems from doubts about the evidence, his discharge is forbidden; rather, it held that in the absence of evidence of an actual constitutional violation and, provided that the judge had otherwise exercised sound discretion in his decision-making, the judge's dismissal of the juror would stand. Applying the rule from *Cleveland* to the case before it, the California Court of Appeal affirmed Williams's conviction. *Taylor*, 2002 WL 66140, at *8.

Williams petitioned the federal courts for a writ of habeas corpus. The Ninth Circuit held that the California Court of Appeal had not "adjudicated Williams's Sixth Amendment claim on the merits" because "the court simply failed to decide the claim without explanation." *Williams*, 646 F.3d at 636. It wrote that "the court engaged in an extended discussion of Williams's *statutory* claim, but made no mention whatsoever of her more fundamental *constitutional* claim."

---

[29]Taylor was the name of Williams's accomplice. Their state appeals were taken together.

*Id.* at 639 (emphasis in original).  Therefore, the Ninth Circuit reviewed the case *de novo*.  *Id.* at 641.  "Because AEDPA's deferential standard of review [did] not apply, Williams [was] not limited to presenting violations of federal law that were 'clearly established . . . as determined by the Supreme Court of the United States.'"  *Id.* at 642 n.14.  Reviewing *Brown*, *Symington*, and *Thomas*, the Ninth Circuit drew its rule from those cases, which it formulated as, "whether, after an appropriately limited inquiry, it can be said that there is no reasonable possibility that the juror's discharge stems from his views of the merits . . . ."  *Id.* at 644.  "If the answer . . . [was] no, the removal of the juror violates the Sixth Amendment."  *Ibid.*  Applying this test, the Ninth Circuit found that the trial judge's removal of the juror had been unconstitutional.  *Id.*at 646.

The Supreme Court did not agree.  The Court began its analysis by noting its previous decision in *Richter*, in which it had held that when a federal claim has been presented to a state court and denied without explanation, a federal court should apply a (rebuttable) presumption "that the state court adjudicated the claim on the merits."  *Johnson*, 568 U.S. at 298.  "We see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims."  *Ibid.*[30]  This holding is, of course, important to our case.

Even more significant to us, however, is the Court's extended discussion of the way in which the Ninth Circuit's decision had failed to appreciate the import of the California Court of Appeal's discussion of the California Supreme Court precedent, *Cleveland*.  *Cleveland*, the Supreme Court noted, had discussed but "expressly declined to follow" *Brown*, *Thomas*, and *Symington.*  568 U.S. at 304.  The discussion of these cases, the Supreme Court observed, showed something more:

> *Cleveland* did not expressly purport to decide a federal constitutional question, but its discussion of *Symington, Thomas*, and *Brown* shows that the California Supreme Court understood itself to be deciding a question with federal

---

[30]The majority and concurrence then proceeded to dispute under what conditions this presumption should be rebuttable, with the majority deciding that it should be rebuttable, particularly in the circumstance "where the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court."  *Johnson*, 568 U.S. at 303.  *Compare ibid.* (majority) *with id.* at 307 (Scalia, J., concurring) (arguing that the presumption should be rebuttable only when the text of the order or local practice makes it clear that the court "*did not purport* to decide the federal question") (emphasis in original).  It is the "inadvertently overlooked" exception upon which the district judge in our case relied.

constitutional dimensions. Indeed, it is difficult to imagine the California Supreme Court announcing an interpretation of Cal.Penal Code Ann. § 1089 that it believed to be less protective than the Sixth Amendment, as any such interpretation would provide no guidance to state trial judges bound to follow both state and federal law.

. . . .

Regardless of whether a California court would consider Williams' § 1089 and Sixth Amendment claims to be perfectly coextensive, the fact that these claims are so similar makes it unlikely that the California Court of Appeal decided one while overlooking the other. Indeed, it is difficult to imagine any panel of appellate judges reading *Cleveland* and passing on the propriety of dismissing a holdout juror under § 1089 without realizing that such situations also bear on the federal constitutional right to a fair trial. The California Court of Appeal's quotation of our definition of "impartiality" from [*United States v. Wood*, 299 U.S. 123, 145–146, (1936)], points to the same conclusion, confirming that the state court was well aware that the questioning and dismissal of [the juror] implicated both state and federal law.

568 U.S. at 305–06 (citations omitted). *Wood* was a Sixth Amendment case, and the Supreme Court credited the California Court of Appeal's citation of it as showing awareness of the constitutional issue, even though the California court did not mention the issue explicitly.

For these reasons, the Supreme Court held that that "the Ninth Circuit erred by finding that the California Court of Appeal overlooked Williams' Sixth Amendment claim." *Id.* at 304. Moreover, the Court took pains to emphasize that it was error for the Ninth Circuit to have held California to the standard set forth in the *Brown* line of cases:

The Ninth Circuit's conclusion to the contrary rested on the fact that *Cleveland* refused to follow *Symington*, *Brown*, and *Thomas*. 646 F.3d at 640. *But the views of the federal courts of appeals do not bind the California Supreme Court when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law.* The Ninth Circuit's apparent assumption that the California Supreme Court could not refuse to follow federal court of appeals precedent without disregarding the Federal Constitution would undo § 2254(d)'s "contrary to" provision, which requires deference unless a state court fails to follow *Supreme Court* precedent. 28 U.S.C. § 2254(d)(1).

*Id.* at 305 (first emphasis added; second in original).

The parallels to our case seem painfully obvious.  Though the district court and Wofford in our case have raised various grounds on which to differentiate the *Williams* cases from ours (*see infra*, pp. 37–41), the facts remain: (1) at trial, in both cases, a holdout juror was removed for cause that was related to, but distinct from, the juror's holdout status; (2) on direct appeal, the California Court of Appeal, like the MCOA, confronted a case in which defendant raised both state and federal claims on brief in a mixed fashion; (3) in each case the state appeals court's decision cited only state precedent; (4) on habeas, the Ninth Circuit, like our district court, held that a state appeals court had overlooked the Sixth Amendment claim because the state court had only discussed a state precedent; (5) both the Ninth Circuit and our district court then did not apply AEDPA deference; (6) reviewing *de novo*, each court then held the state to the *Brown-Thomas-Symington* rule and granted habeas.

But an eight-Justice majority of the Supreme Court (with the ninth Justice writing an even more emphatic concurrence) reversed the Ninth Circuit.  The Supreme Court held that it was error to presume that the California courts had ignored the constitutional question in *Taylor* and in *Cleveland*.  Tracing references in these state-court decisions to federal cases on the Sixth Amendment, the Supreme Court found it particularly unlikely that the California courts had ignored that amendment in their reasoning.  Moreover, the Supreme Court stated that it was error to hold the state to the *Brown-Thomas-Symington* rule on habeas review when the state's own courts had not adopted that rule.

Given the significant similarities between Williams's case and Wofford's, we should do as the Supreme Court did and reverse—absent some other argument distinguishing the two.  To such arguments we now turn.

### E.  Purported Distinguishing of *Wofford* from *Williams* and *Johnson* Fails

The district court and Wofford have both attempted to distinguish our case from *Johnson* on various grounds.  Ultimately, none are convincing.

As we have seen, after *Richter* and *Johnson*, only one narrow path remained for those who would argue that a claim has been properly presented to the state court (so as to be preserved for habeas review and not forfeited under AEDPA), but not deemed to have been

reviewed on the merits and decided by the state courts, even *sub silentio*: arguing that a claim had been presented, but fundamentally misunderstood. This does happen,[31] and indeed the difference between the claim as presented and the claim as examined by the state courts can be fairly narrow and still overcome the post-*Johnson* AEDPA barriers to *de novo* review.[32]

The district court held that this is Wofford's situation. First, the district court held—correctly—that Wofford had raised a Sixth Amendment challenge and had cited *Thomas*, thus presenting the issue to the MCOA and preserving it for federal habeas review. *See Scott*, 760 F.3d at 503–04. Then, the district court held that the MCOA had overlooked Wofford's Sixth Amendment claim. This was shown, the district court reasoned, by the fact that the MCOA had failed to cite *Thomas*, *Brown*, *Symington*, or "a like case[,]" and that, as to the Michigan cases that the MCOA did cite, "none of those decisions involved the test set out in *Brown*, *Thomas*, and *Symington*."

In attempting to differentiate *Johnson*, the district court examined the MCOA's engagement with *Tate*, 624 N.W.2d 524. The district court emphasized certain language from *Tate* cited in the MCOA's *Wofford* opinion: "*While a defendant has a fundamental interest in retaining the composition of the jury as originally chosen*, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate." *Tate*, 624 N.W.2d at 529 (emphasis added by district court). The district court observed that the emphasized language "stems from a line of federal cases holding that once a jury is empaneled, . . . by declaring a

---

[31]*See, e.g. Campbell v. Bradshaw*, 674 F.3d 578, 585–87 (6th Cir. 2012); *Jells v. Mitchell*, 538 F.3d 478, 486–89 (6th Cir. 2008); *English v. Romanowski*, 602 F.3d 714, 725–26 (6th Cir. 2010); *see also, e.g.*, *Bauder v. Dept. of Corrections*, 619 F.3d 1272, 1274–75 (11th Cir. 2010). *But see Smith v. Cook*, 956 F.3d 377, 387–88 (6th Cir. 2020) (casting doubt on the "continued vitality" of *Campbell* and *Jells* after *Johnson*, in light of the latter's "healthy presumption of merits adjudication.").

[32]In *Campbell*, for example, we held that the Ohio Supreme Court had misconstrued the petitioner's argument that the trial court had prevented him from arguing voluntary intoxication as a mitigating factor, treating it instead as an argument that the trial court had failed to give a jury instruction on voluntary intoxication. We thus applied *de novo* review. 674 F.3d at 596. Similarly, *English v. Romanowski*, a *Strickland*-AEDPA case, concerned a defense attorney who had promised the jury a key witness, only to refuse to put her on the stand during trial due to concerns about her credibility and character. 602 F.3d at 723–24. We held that the Michigan courts had mistaken a claim about failure to investigate a witness properly before trial for a (separate) claim about whether to call her. We reviewed *de novo*. *Id.* at 728.

mistrial too soon, a trial court may infringe the defendant's Fifth Amendment right to end his jeopardy[]." But, the district court held, "[t]he Fifth Amendment right to avoid prolonged (or double) jeopardy is not the same as the Sixth Amendment right to a unanimous verdict." On this ground, the district court sought explicitly to distinguish *Johnson*:

> Thus, this case is unlike *Johnson v. Williams*, where the Supreme Court reversed the Ninth Circuit's *de novo* application of *Symington*. *See* 568 U.S. 289, 305 (2013) (finding § 2254(d) applied where state court cited *Cleveland*, and, in turn, *Cleveland* discussed *Brown*, *Thomas*, and *Symington*).

Thus, the district court's logic runs, because the Michigan courts cited a state-court line of reasoning on juror removal that derived from a *Fifth* Amendment lineage, that indicates that they were not cognizant of the *Sixth* Amendment aspect of his claims. *Expressio unius est exclusio alterius*, in other words. In this analysis, *Johnson* was different because the California courts cited *Brown*, *Symington*, or *Thomas*, thus showing awareness of the Sixth Amendment claim. Because the MCOA in this analysis overlooked Wofford's Sixth Amendment claim, their decision is not subject to AEDPA deference—thereby distinguishing *Johnson*. As a bonus, moreover, the very thing that distinguishes *Johnson* allows the district court to do what *Johnson* would not allow: apply the *Brown-Thomas-Symington* rule against the state on *de novo* review of the habeas petition.

But this analysis is not convincing. First, the district court's analysis of the MCOA's silence as to *Brown, Thomas*, *Symington*, or the rule they embody is troubling. As we have just seen, the district court used this silence as a basis both for holding that the MCOA had overlooked Wofford's Sixth Amendment claim and also for distinguishing Wofford's case from *Johnson*. But of course, *Johnson* says that the state courts do not have to follow those cases. 568 U.S. at 305. It would be perverse to demand that, in order to show that it had considered Wofford's Sixth Amendment claim and thus should receive AEDPA deference, the MCOA had to name-check three cases that it is *not* required to apply. The same goes for the rule those cases embody. Similarly, if the district court's implication is that "§ 2254(d) applied" in *Johnson* "where state court cited *Cleveland*" *because* "in turn, *Cleveland* discussed *Brown*, *Thomas*, and *Symington*," that is incorrect. The Supreme Court held very nearly the opposite: the California

court were within their rights to rely on *Cleveland and not Brown*, *Thomas*, and *Symington*, whether cited or not.

The bigger problem is that the court's *expressio unius* analysis rests on a purported division between the Fifth- and Sixth-Amendment precedent that is not supported by Michigan's case law. *Wofford* cited *Tate*. *Tate* rests on *Dry Land*. But as we have seen, *Dry Land*, in addition to discussing cases about the Fifth Amendment's Double Jeopardy Clause, cites a series of federal cases about juror removal during deliberation, all of which are rooted in (and all but one of which discuss) the Sixth Amendment: *Hillard, Kopituk*, *Phillips*, *Henderson*, and *Kaminski*. *See supra* pp. 27–29. Indeed, *Dry Land* discusses *Phillips* and *Hillard* at some length. *Id.* at 328–31. As if to confirm its focus, in the same string of citations, *Dry Land* cites a treatise, Anno: *Constitutionality and construction of statute or court rule relating to alternate or additional jurors or substitution of jurors during trial,* 84 ALR2d 1288, that discusses the Sixth Amendment implications of juror removal. It is not surprising, moreover, that *Dry Land* (and, through it, *Tate* and *Wofford*) dealt with both Fifth *and* Sixth Amendment concerns, since, as we have seen, double-jeopardy, mistrial, and trial-by-jury rights are all logically and historically implicated when a juror is dismissed and replaced with an alternate. Thus, it is unconvincing to hold that the Michigan courts, in drawing on this line of cases, were not engaging with, or were unaware of, the Sixth Amendment aspect of this problem.

Just as the Supreme Court found it "difficult to imagine the California Supreme Court [in *Cleveland*] announc[ed] an interpretation of Cal.Penal Code Ann. § 1089 that it believed to be less protective than the Sixth Amendment," we find it difficult to imagine that the MCOA did not consider the Sixth Amendment's protection when they wrote *Dry Land* and *Tate*. *Johnson*, 568 U.S. at 305. And just as the Supreme Court also found it "difficult to imagine any panel of appellate judges [in *Taylor*] reading *Cleveland* and passing on the propriety of dismissing a holdout juror under § 1089 without realizing that such situations also bear on the federal constitutional right to a fair trial," so too, we find it difficult to imagine that the MCOA, in deciding *Wofford*, passed on the propriety of dismissing Juror M under *Tate* without realizing that the situation also bore on Wofford's Sixth Amendment jury right. *Johnson*, 568 U.S. at 305.

Our conviction in reaching both of these conclusions comes not just from presumption; rather, it is reinforced significantly by *Dry Land*'s discussion of Sixth Amendment precedents.

Incidentally, the history recited above also means that even on the district court's own logic, the attempted distinctions would fail. The connection that shows consideration of the Sixth Amendment in Williams's case looks like this: the California Court of Appeal, in assessing Williams's appeal, relied on *Cleveland*, which discussed *Brown*, *Symington*, and *Thomas*, which turned (in part) on the Sixth Amendment. In our case, the MCOA, in assessing Wofford's appeal, relied on *Tate*, which discussed *Dry Land*, which discussed *Phillips* (and four related cases), which turned (in part) on the Sixth Amendment. Graphically:

- CA Court of Appeal→*Cleveland*→*Brown/Symington/Thomas*→Sixth Amendment

- MI Court of Appeals→*Tate*→*Dry Land*→*Phillips*→Sixth Amendment

Whatever else the case may turn on, the constitutional analysis cannot turn on that extra level of citation. Attempts to differentiate *Johnson v. Williams*, in other words, have only strengthened the conviction that it should apply.[33]

### F. Michigan Chose to Require Actual Prejudice – As It Is Allowed To

The courts in the *Brown-Thomas-Symington* cases, just as *every* other court, agree that it would be constitutional to remove a juror who is misbehaving, ill, or otherwise unable to

---

[33]Wofford raises two other arguments as to why the MCOA should not be presumed to have examined the federal claim. First: "The court stated that the standard of review was abuse of discretion. It did not apply de novo review as is required for constitutional claims." But in Michigan, the abuse-of-discretion inquiry requires the judge to "weigh[] a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate"—i.e., it incorporates the constitutional analysis within the idea of what discretion is "sound." *Tate*, 624 N.W.2d at 529. *Cf. United States v. McGill*, 815 F.3d 846, 867 (D.C. Cir. 2016) ("[W]e review a district court's decision to excuse a juror only for an abuse of discretion. . . . [T]he Sixth Amendment constrains the district court's discretion to remove a juror." Although—or perhaps, noteworthily—*McGill* is a case in a circuit where *Brown* is good law, this basic framework seems consistent.).

Second, Wofford argues that the MCOA "identified the issue as one of 'due process,' indicating that the court was at the very least viewing the claim through the lens of the Fifth Amendment, not the Sixth Amendment." (Quoting *Wofford*, 2015 WL 1214463, at \*1). But of course, Sixth Amendment rights are incorporated against the states via the Due Process clause of the Fourteenth Amendment. *See Ramos*, 140 S. Ct. at 1397; *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). Thus this statement—which in any event comes only in the MCOA's standard of review—does not support Wofford's argument. Indeed, as the Fourteenth Amendment's Due Process Clause is the vehicle by which the Bill of Rights is incorporated against the states, such a reference marginally increases the impression that the MCOA would be considering the full panoply of such rights as they applied to Wofford's case.

deliberate. *See Brown*, 823 F.2d at 597; *Thomas*, 116 F.3d at 613–14. *Symington*, 195 F.3d at 1085. What sets the *Brown* line apart from the *Phillips-Dry Land* line or *Cleveland* is that *Brown* is prophylactic. Reasoning that it will not always be easy to tell when a dismissal is justified versus when it stems from a juror's opinion on the case—especially without penetrating the secrecy of the jury room—each version of the *Brown* test requires that the dismissal be denied (or, in the appellate posture after conviction, that a new trial be ordered) in any case where there is a reasonable possibility that the juror's removal was related to the merits. *See Brown*, 823 F.3d at 596.

*Cleveland* is *not* prophylactic. It requires an actual constitutional violation to order a new trial. 21 P.3d at 1236. *Dry Land* also rejects a prophylactic approach, preferring to require actual prejudice when examining juror removal. And *Johnson* stands for the idea that which approach to take is a choice for the state to make.[34]

The background of Michigan law indicates that the Michigan courts are aware of Sixth Amendment concerns and know how to address them. *See People v. Cooks*, 521 N.W.2d 275, 278 (Mich. 1994) (recognizing a unanimous jury right under state law); *People v. van Camp*, 97 N.W.2d 726, 733 (Mich. 1959) (holding that the state juror-removal statute does not violate a defendant's right to a unanimous jury) (cited in *Dry Land*, 437 N.W.2d at 325–26); and *People v. Tyburski*, 518 N.W.2d 441, 447 (Mich. 1994) (recognizing incorporation of the Sixth Amendment "fair and impartial jury" right against the states (citing *Duncan v. Louisiana*, 391 U.S. 145 (1968)). To accept Wofford's theory for why AEDPA should not apply, we would have to hold that the MCOA ignored *and sub silentio* contravened all of these precedents in assessing his case. The better reading is that it considered the problem and saw no constitutional violation. We are commanded to presume that the Michigan court made this choice fully considering the *Thomas* argument and deciding the constitutional issues thus posed on the merits. But even more so, in referencing—and sticking with—the *Tate-Dry Land* line of precedents here, it seems quite plausible that the Michigan court was making a conscious choice.

---

[34]The Sixth Circuit has not adopted—or rejected—the *Brown-Thomas-Symington* rule for federal criminal cases in this circuit. We do not decide whether to do so today. Rather, we simply observe that, per *Johnson*, the choice of whether to do so or to adopt a rule requiring an actual constitutional violation (or some other rule above this floor) is one for the individual states to make.

Admittedly, the MCOA considered the problem in light of the rules as distilled into one case, not with the explication displayed here today. But we are not here to grade Michigan's homework, only to assess whether there was an egregious constitutional violation. *Johnson* and *Richter* are reminders that the federal courts cannot "impose mandatory opinion-writing standards on state courts." *Johnson*, 568 U.S. at 300; *see also Richter*, 562 U.S. at 99.

The conclusion from the foregoing is clear: in light of *Johnson*, the district court should have afforded AEDPA deference to the Michigan *Wofford* ruling, if not under *Johnson*'s presumption, then because of the manifest similarities between *Wofford* and *Johnson*. (Indeed, the district court's repeated citations to the overturned *Williams v. Cavazos* decision are troubling: saying "*rev'd on other grounds sub nom. Johnson v. Williams*" does not make it so.) The district court should, moreover, have recognized that, as a close look at *Tate* shows, the Michigan courts were drawing on a line of state precedent that considered the Sixth Amendment. *Wofford* is, in short, unable to show the requisite "evidence [that] leads very clearly" to the conclusion that his Sixth Amendment claim was overlooked. *Johnson*, 568 U.S. at 303. AEDPA thus applies.

## V. Legal Analysis Under AEDPA, Applied

Wofford needs a prophylactic rule, because without one he must lose: the Michigan courts found—and we have upheld the finding—that Juror M was removed from the jury for cause. *See supra*, pp. 18–20. The MCOA ruled that "flagrantly violat[ing] the court's instructions by discussing the deliberations with a non-juror" provided good cause for dismissal under Michigan law. *Wofford*, 2015 WL 1214463 at *2. Indeed, Wofford did not argue before the MCOA, and does not argue before us, that the trial court lacked a just cause for Juror M's dismissal. *Ibid.* And the MCOA held that her dismissal was *because of* this conduct, not because of her opinion on the case. *Id.* at *2–3. We have upheld that factual finding as well. *See supra*, pp. 18–20. There was, in other words, no actual constitutional violation here—only some factors that might make a prophylactically minded court concerned about one. Michigan chose not to go in that direction.

Since AEDPA applies, we cannot use *Brown-Thomas-Symington* as the benchmark to evaluate the decisions of the Michigan courts. *Johnson*, 568 U.S. at 305. The *Williams* cases are yet again instructive: on remand from the Supreme Court, reconsidering the case under AEDPA, the Ninth Circuit found that there was no Supreme Court case directly on point and thus denied the petition for a writ of habeas corpus. *Williams v. Johnson*, 840 F.3d 1006, 1009–11 (9th Cir. 2016); see also *id.* at 1009 ("Williams has not cited any Supreme Court case imposing (or even hinting at) the *Symington* rule. Nor are we aware of such a case."). Similarly, Wofford has not cited a Supreme Court case here that would support the application of the *Brown-Thomas-Symington* rule or of any other analogous rule. Therefore, Wofford's arguments should fail: his "argument cannot succeed because he does not cite any precedent from the United States Supreme Court[,]" *Scott*, 760 F.3d at 506, to which the Michigan court's ruling was contrary. 28 U.S.C. § 2254(d). Thus, reviewing this part of the district court's decision *de novo*, we reverse the grant of a writ of *habeas corpus* to Wofford.

## VI. Conclusion

For the foregoing reasons, we uphold the factual findings of the district court, but REVERSE its legal conclusion, and REMAND the case for further proceedings consistent with this opinion.